UNITED STATES of America,
Plaintiff-Appellee,

v.

Herman Tyrone HARRIS et al.,
Defendants-Appellants.

Nos. 75–1360, 75–1399, 75–1409 to
75–1415 and 75–1421.

United States Court of Appeals,
Seventh Circuit.

Argued April 5, 1976.

Decided Oct. 12, 1976.

John R. Wilks, U.S. Atty., Fort Wayne, Ind., Richard A. Hanning, Asst. U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Terrance L. Smith, East Chicago, Ind., Frank J. Galvin, Jr., Hammond, Ind., Donald S. Eisenberg, Madison, Wis., Sheldon H. Cohan, Gary, Ind., Steven R. Crist, Highland, Ind., Jay N. Given, East Chicago, Ind., Cornelius E. Toole, Chicago, Ill., Michael L. Muenich, Hammond, Ind., Hawk P. C. Kautz, Merrillville, Ind., for defendants-appellants.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and WYZANSKI, Senior District Judge.[*]

PELL, Circuit Judge.

This is the fourth case to reach this court as a result of the Government's efforts to break up the drug ring of the so-called Family. The prior cases to reach this court were: *United States v. Hillsman*, 522 F.2d 454 (7th Cir. 1975), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed.2d 410; *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976); *United States v. Jeffers*, 532 F.2d 1101 (7th Cir. 1976), *cert. filed*, 44 U.S.L.W. 3739. No purpose would be served by repeating the facts which form the basis for these cases; they are amply set forth in our prior opinions. The particular facts relevant to the issues raised on this appeal are set forth in our discussion of those issues. We further observe at this outset point that the diversity and complexity of those issues necessarily has resulted in a regretful prolixity in this opinion. This appeal, however, demonstrates once more that in a conspiracy case with numerous defendants a direct relationship is discernible between the proliferation of parties and issues.

### I. Adequacy of the Information Provided to the Defendants Prior to Trial

The defendants complain of a general lack of discovery in this case; the Government responds that a large amount of discovery was allowed, that it complied with the district court's orders, and that the defendants were not prejudiced by the Government's refusal to provide all the materials that were requested. This general disagreement only reflects that the Government and the defendants are on opposite sides in the present litigation. The district court ordered the Government to reveal, *inter alia*, the date, the time, and the place of each overt act. It also ordered the Government to disclose the participants in

[*] Charles E. Wyzanski, Jr., Senior District Judge of the United States District Court for the District of Massachusetts, is sitting by designation.

the overt acts other than Government informers. The Government filed reports which purported to comply with this order and also filed much other material. The Government in answering indicated that it did not have some of the information requested, but the defendants have not argued or established that this was untrue. This court need not discuss the other information which was disclosed but will discuss the major items which the defendants argue should have been revealed to them.

The defendants desired lists of witnesses from the Government. Defendant Bullock raises also this point in his supplemental brief. Defendants cannot obtain lists of Government witnesses as a matter of right, although the district court has discretionary power to order it to provide a list. *United States v. Jackson*, 508 F.2d 1001, 1006–07 (7th Cir. 1975). The district court did not abuse its discretion by refusing to do so in this case. The Government did not wish to reveal this information because of physical danger to witnesses as well as the possibility of threats and intimidation. The sealed materials provided to the district court by the Government in support of its contentions regarding dangers to witnesses amply establish that the Government's fears were not unwarranted.

The defendants indicate that the Government's compliance with the court's discovery order was incomplete. William Douglas was listed as a participant in two overt acts but not as a participant in another. The Government justifies the omission on the grounds that he was a Government informer and therefore not within the scope of the order. The defendants do not appear to contend that he was not an informer; but because his identity had been revealed, the Government does not appear to have had cause not to have indicated his participation. The Government did, nevertheless, comply with the letter of the court's order. The Government apparently concedes that it erroneously omitted Horace Clay III as a participant in one overt act. The defendants have made no showing, however, that the Government knew that Clay was a participant or that Clay was in any way specifically prejudiced by the omission. An error in administering discovery rules is not reversible unless it is shown that the error was prejudicial to the substantial rights of the accused. *United States v. Owen*, 492 F.2d 1100, 1110 (5th Cir. 1974), *cert. denied*, 419 U.S. 965, 1019, 95 S.Ct. 227, 42 L.Ed.2d 180. The Jencks Act materials provided after the testimony of Isaac Davis contain the statement: "Pimp [Horace Clay] is not a Family member. He associated with the Family, but Davis knew of no specific duties that Clay performed." The defendants argue that this information should have been provided prior to trial because it was exculpatory. Counsel for Clay moved for a mistrial because this information was not disclosed, but the court denied the motion. The statement is not exculpatory. The Government never has contended that the conspiracy charged was co-extensive with membership in the Family. During a pretrial conference the Government represented that there were no phone conversations recorded involving these defendants. The Jencks Act materials show that a conversation was recorded, but the defendants have not shown that any of the present defendants were parties to that conversation. Defendant Bullock in his supplemental brief makes general contentions regarding the lack of discovery as to him. Specifically, however, what he contends is that certain statements which witnesses testified Bullock made to them were not revealed prior to trial. The law in this circuit is clear that the Jencks Act forbids a district court from ordering the production of statements of Government witnesses, even if they contain statements made by defendants, prior to the time the Government witnesses testify. *United States v. Feinberg*, 502 F.2d 1180 (7th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975); *United States v. Callahan*, 534 F.2d 763 (7th Cir. 1976).

## II. Adequacy of the Information Provided to the Defendants During Trial

The defendants argue that the court committed reversible error in administering the

Jencks Act, 18 U.S.C. § 3500, and that the Government's compliance with section 3500 was inadequate. We shall discuss the points raised seriatim.

■ The defendants argue that the court erred on three occasions regarding notes taken by Government agents. The Jencks Act only requires notes taken by Government agents to be produced if they are a substantially verbatim transcript of a statement of a witness or if the notes have been signed or otherwise adopted or approved by a witness if the witness has not read the notes and the person taking the notes did not read them back to him. *Goldberg v. United States*, 425 U.S. 94, 110–11 n. 19, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976).

■ VanBokkelen, the prosecuting attorney in this case, took notes on an interview with Isaac Davis, a Government witness. VanBokkelen stated that Davis had never seen the notes or had a chance to adopt them. The defendants' position at trial was that it was sufficient under the Jencks Act to require production if the Government had had the opportunity to have the witness review the notes. This is clearly not the law. No one argued at trial that the notes were a verbatim transcript of the interview, as is argued in this court. In any event, the trial court examined the notes; and if they were a substantially verbatim transcript within the meaning of the act, this most likely would have been apparent. Short excerpts are not producible as verbatim transcripts. *Palermo v. United States*, 360 U.S. 343, 352–53, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). The court did not err by refusing to order the Government to produce the notes.

■ VanBokkelen also took notes on an interview with Esker Dodson. The notes were given to defense counsel voluntarily; but at the time they were turned over, VanBokkelen indicated that they were not § 3500 material, that the witness had not seen the notes, and that they had been made for the most part after the interview was over. We are unable to say that the

court abused its discretion under these circumstances in not allowing cross-examination of Dodson on the basis of these notes.

■ Henry Harris, a witness for the Government, testified that he had been interviewed by Special Agent Schabillion and that notes were made by Schabillion. He indicated that he had read some handwritten notes. Schabillion testified that he took notes when he interviewed Harris, that he utilized those notes for asking questions before a court reporter, and that he had destroyed the notes after they were incorporated into the formal statement prepared by the court reporter. He indicated that to the best of his recollection he had neither read the notes to Harris nor showed them to him. Harris indicated that he had told Schabillion about Patterson's and Bullock's activities at Clayman's Lounge [1] and that these statements had not been incorporated into the formal statement. The court found that Schabillion had destroyed his notes in good faith, but struck Harris' testimony with regard to Patterson because it found that the Government was negligent in not incorporating Harris' testimony about him in the formal statement. The Government argues that it was error for the court to order Harris' testimony against Patterson struck, but we need not decide this issue. It was not error for the court to permit the testimony to be used against other defendants. In *United States v. Hilbrich*, 341 F.2d 555 (7th Cir. 1965), *cert. denied*, 381 U.S. 941, 85 S.Ct. 1775, 14 L.Ed.2d 704, this court held that when a district court found no bad faith and no prejudice to a defendant, an FBI agent's destruction of interview notes which had been incorporated into a formal report did not violate the Jencks Act. It has been held that nothing in the Jencks Act requires that notes made in the course of an investigation be preserved after they have served their purpose in the preparation of interview reports. *United States v. Pacheo*, 489 F.2d 554 (5th Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975).

1. See Part XII *infra*.

We are not unmindful of the differing view of the District of Columbia Circuit. *See United States v. Harrison*, 173 U.S.App.D.C. 260, 524 F.2d 421 (1975).

■ The defendants protest inaccuracies in the Jencks Act materials supplied, but the errors cited neither show bad faith on the part of the Government nor significant carelessness. Clearly, they did not prejudice the defendants. One error was in the date of witness Allen's prior conviction for violating the Dyer Act. This error caused some confusion during the cross-examination of Allen. Also, some confusion occurred because the source of the information was the marshal's office in South Bend, but the conviction occurred in Lafayette. The Assistant United States Attorney, however, explained the error to the jury, correcting the date as being 1970 rather than 1974. An error regarding the date another witness was convicted was corrected by the Government before the defendants' cross-examination of the witness began; the date the witness was fingerprinted had been shown as the date on which he was convicted. Finally, confusion occurred as a result of one page of a report containing the date the report was dictated rather than the date on which it was typed. Although every effort should be made to avoid them, clerical inaccuracies will arise in many types of materials presented in judicial proceedings. It would be a very unusual case for such errors to be a cause for reversal. This is not such a case.

■ A report on an interview by a Government agent with witness Brown was produced as Jencks Act material. The page numbers on the pages produced showed that certain pages were missing. The Government explained that the report was of a joint interview of Brown and another person who was not a witness and that the pages given the defendants were the only ones which pertained to the witness. The court accepted the Government's explanation and declined to inspect the entire report *in camera*. The defendants argue that this was an abuse of discretion. In *Palermo v. United States, supra*, 360 U.S. at 354, 79 S.Ct. at 1225, the Supreme Court stated:

[T]he Government will not produce documents clearly beyond the reach of the statute for to do so would not be responsive to the order of the court. However, when it is doubtful whether the production of a particular statement is compelled by the statute, we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination.

If separate reports had been prepared on the portions of the interview dealing with each person, there could be little question that the Government would only be required to produce the report pertaining to the witness. The Act contemplates that the Government will make this type of selection. We find no significant difference between the Government making this type of selection and the selection the Government made in this case. The trial court did not abuse its discretion by declining to examine the portion of the report which was not produced. The problem presented in this case is not a matter of the Government refusing to submit materials in the face of a court order; the court expressed no interest in seeing the materials. Also, situations must be distinguished where the Government declines to produce a portion of a statement of a witness as contemplated by section 3500(c).

■ The defendants desired transcripts of testimony given in certain prior trials. The court granted their motion subject to the court reporter's ability to prepare them. The defendants argue that they should not because of practical difficulties have been denied materials to which they had a right. The defendants also argue that they should have received the transcripts of certain witnesses' guilty plea proceedings. This court, however, has held that a transcript of a witness' testimony in a prior trial is not within the Jencks Act. *United States v. Baker*, 358 F.2d 18 (7th Cir. 1966), *cert. denied*, 385 U.S. 869, 87 S.Ct. 135, 17 L.Ed.2d 96. The district court, therefore, was acting well within its discre-

tion in not delaying the trial while the transcripts were prepared and in not making available transcripts which the court had found reason to seal. Such materials are normally a matter of public record and should be made available where practical.[2] Of course, disclosure of evidence educed in a prior judicial proceeding is mandatory if that evidence would exculpate any of the present defendants.

The defendants speculate in their brief that material sealed pursuant to certain docket entries is similar to that discussed above and should have been disclosed to them under the Jencks Act. We have examined the materials and find that they were not even arguably discoverable under the Jencks Act, the defendants' speculation being incorrect.

### III. Selection of an Impartial Jury

■ All of the defendants indicate that it was error for the court to deny motions to transfer the trial from Hammond due to pretrial publicity, but only Bullock develops the argument. Fed.R. Crim.P. 21(a) provides that a district court shall transfer proceedings:

> if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

There is no question that the Family trials received substantial publicity; many newspaper clippings are part of the record on appeal. Substantial publicity, however, is not sufficient cause to require transfer. In this case the trial judge denied the motion to transfer and was apparently convinced that the defendants could receive a fair trial. The defendants have not shown that the trial judge abused his discretion in so ruling. The voir dire of prospective jurors did not turn up substantial prejudice.

The question remains as to whether the voir dire procedure was adequate to turn up prejudice if it existed and to eliminate jur-

ors who in some way exhibited prejudice. The defendants argue that the voir dire was unfair because they were unduly limited in the number of peremptory challenges they were allowed to exercise and because the examination of prospective jurors was inadequate.

Fed.R.Crim.P. 24(b) provides that in a case such as the present one, the Government is entitled to six peremptory challenges and the defendant or defendants jointly to ten. The court is given discretion in cases involving more than one defendant to grant the defendants additional peremptory challenges and to permit them to be exercised either separately or jointly.

■ Initially the trial court did not grant additional challenges. Five challenges were exercised jointly, but the defendants could not agree on others. The court then gave each of the twelve defendants one more challenge to be exercised separately. The Government was given no additional challenges. The trial court did not abuse its discretion by breaking the deadlock in this fashion. *See United States v. Franklin,* 471 F.2d 1299, 1300 (5th Cir. 1973). At best the defendants can complain that they did not receive adequate joint challenges; but at the time the twelfth juror was selected, it appears that two of the defendants had not exercised their challenges. The trial court continued to allow the defendants to confer regarding the exercise of their challenges. The defendants argue that the record does not show that they continued to exercise their challenges jointly, but this misses the significance of the Government's argument regarding the remaining challenges. Had additional joint challenges been granted, all the defendants would have had to agree to exercise them. The two defendants who had challenges but did not exercise them could effectively have vetoed the exercise of additional joint challenges. Had they agreed, the challenges they possessed could have been exercised. The seventeen challenges which the trial

2. The Government indicates that some of the transcripts which the defendants indicate they

should have received were complete before trial and available as matters of public record.

court allowed were sufficient for the defendants to protect their rights. Undoubtedly the defendants would have preferred sufficient challenges for them to attempt to "stack the jury," but this is not the purpose of peremptory challenges.

The defendants argue that the scope of the trial court's voir dire of prospective jurors was inadequate for them intelligently to exercise their peremptory challenges. In *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court indicated that while nothing in the Constitution requires Congress to grant peremptory challenges, they are nevertheless one of the important rights of the accused and impairment of that right is reversible error without the showing of prejudice. The function of the challenge is not only to eliminate extremes of partiality on both sides but also to ensure that the jurors will try the case on the basis of the evidence before them. *Id.* The focus regarding the adequacy of the voir dire process is exclusively on "whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present." *United States v. Dellinger,* 472 F.2d 340, 367 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). The defendants must be permitted sufficient inquiry into the background and attitudes of prospective jurors to enable them to exercise intelligently their peremptory challenges. *Id.* at 368. Extensive pretrial publicity presents special problems. In *Dellinger* this court held:

> [W]here pretrial publicity is of a character and extent to raise a real probability that veniremen have heard and formed opinions about the events relevant to a case, and at least where . . . the defense has brought the pretrial publicity to the court's attention and requested voir dire inquiry, the court must make inquiry adequate to determine whether anyone has read or heard about the facts, and, if so, what the impact has been on his ability to serve as an impartial juror. [Footnote omitted.]

*Id* at 374. General questions, such as "Is there any reason you cannot fairly and impartially try this case?" are insufficient to protect a defendant's rights. *United States v. Lewin,* 467 F.2d 1132, 1138 (7th Cir. 1972); *United States v. Dellinger, supra* at 375. So long as the trial judge acts within these guidelines, he has substantial discretion regarding the manner in which he conducts the voir dire examination. On review this court will not interfere with the manner in which he conducts the voir dire examination unless there has been a clear abuse of that discretion. *Silverthorne v. United States,* 400 F.2d 627, 638 (1st Cir. 1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971).

The defendants place substantial reliance on *Silverthorne,* but the facts in that case were substantially different. In *Silverthorne* every potential juror indicated some knowledge of the case. Almost thirty-percent of those examined expressed opinions on the appellant's guilt. Only five of the jurors were questioned individually by the court; the remainder were only questioned generally. Four of the jurors ultimately impaneled never responded to the court's questions concerning their opinions of the case, and two of those four were never questioned on the publicity issue. The entire voir dire on the subject of publicity for the twelve jurors impaneled was sufficiently succinct that it could be set forth in the margin of the opinion on less than two pages.

The selection of the jury in the present case took five days. The judge interrogated the entire panel, asking general questions, at some length and gave the attorneys an opportunity to submit additional questions to him. He then questioned each prospective juror individually, outside of the presence of the other prospective jurors and jurors who had been seated. In *Dellinger* we commended the practice of questioning of jurors individually, outside the presence of other jurors, although we have not required it. 472 F.2d at 376–77. The judge then gave the attorneys a chance to suggest additional ques-

tions and in many cases acted on their suggestions. The attorneys were then given a chance to challenge the prospective juror either for cause or peremptorily. During the general questioning, nineteen of the sixty-five called indicated that they had read something about the case in the newspaper. None indicated that they could not put aside what they had heard and limit their consideration to the evidence presented in the courtroom. The trial court also explored these issues with the jurors individually.

The defendants in their brief discuss at some length the trial court's questioning of various prospective jurors and argue that various portions of the questioning were inadequate. We have examined the transcript of the voir dire proceeding, giving special attention to those portions which the defendants allege were inadequate. It would serve no purpose to analyze each of these incidents in this opinion. Each of the incidents involved a prospective juror's prior knowledge of the Family or this case. The defendants' general complaint is that the court did not go sufficiently into the details of what the prospective jurors had heard. Most indicated in effect that he or she had read something about the Family in a newspaper. None indicated that he or she had any opinion as to the present defendants' guilt or innocence, and all indicated that they understood that they must decide the case on the basis of the evidence heard in court. On some occasions the court went into more detail with prospective jurors where the person indicated more detailed knowledge. On several occasions during side-bar conferences the court indicated in response to a request that it would go into more detail about what the person being questioned had heard. The judge then asked the prospective jurors other questions which he had agreed to ask but failed to ask the additional questions regarding prior knowledge. No one called these oversights to his attention.

The defendants make especially vigorous argument about the questioning of Augustine Sandlin, who became the foreman of the jury. The defendants allege that she was not examined with respect to prior knowledge, but the record does not bear out this allegation. Sandlin was asked whether she had heard or read anything pertaining to the case to which she answered, "No." The objection the defendants raise seems to be that the question was phrased in terms of the knowledge of this case rather than knowledge of the "Family." Generally when questioning the jurors the court had referred to the Family by name. The court had, however, indicated the nature of the charge and questioned her regarding whether she understood that it was her obligation to limit herself to what she saw and heard in the courtroom should something strike a responsive chord during the trial about something she had heard. No objection was made at the time of the questioning that the judge had not mentioned the "Family"; indeed, counsel for one of the defendants excluded her when challenging jurors on the basis of knowledge about the Family because she indicated that she had no knowledge. All the defendants joined in the challenge without contradicting him regarding Sandlin. Sandlin was challenged for cause because she had children at home, but several of the defendants declined to join in the challenge. One of the defendants requested an additional peremptory challenge to challenge her on this basis, but again no mention was made of her prior knowledge.

Based on our examination of the voir dire transcript, we are satisfied that the prospective jurors were adequately examined. It is easy to point to imperfections in an appellate record, but they do not mean that a defendant's substantial rights were affected. At trial counsel for one of the defendants requested that the judge "use [the] tendered voir dire . . . in the order that they were tendered and in the exact language." Defendants do not argue on appeal that this was required, but it appears doubtful that they would have been satisfied with less. Even assuming that all of a defendant's tendered questions are proper, a trial judge need not ask them

as tendered; his discretion is broader than that.

## IV. Effect of Proposed Stipulations

Two defendants offered to stipulate to the existence of a conspiracy to distribute narcotics, their defense being that they were not members of that conspiracy. Counsel for one of these defendants indicated in his opening statement to the jury that a conspiracy existed. The other defendants argue that either they should have been severed or the Government should not have been permitted to introduce evidence of the conspiracy but only to introduce evidence showing the defendants' participation.

 The defendants cite no authority for this novel argument other than *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which involved the admission of an extrajudicial confession and which is not in point. The essence of a stipulation is an agreement of the parties, albeit a judicially sanctioned one. *See United States v. Three Winchester 30–30 Caliber Lever Action Carbines,* 504 F.2d 1288, 1290 (7th Cir. 1974). At most, in this case certain defendants had made a concession. There is no indication in the record that the Government agreed to the purported stipulations, and the trial judge did not view it as having done so. That the Government had to prove the facts contained in the purported stipulations, and therefore might be said in a loose sense to agree with the stipulations, does not mean that the stipulations had any binding effect on the Government since it did not enter into them. The trial court has discretion to limit the introduction of repetitive or prejudicial testimony; and had all the defendants conceded the existence of a conspiracy, undoubtedly it would have limited the Government's evidence. All the defendants were not willing to stipulate, and it was not error for the court to allow the Government to prove its case.

 In any event, it does not appear that the proposed stipulations were brought to the attention of the jury; and statements of counsel in opening statements are not evidence.

## V. Defendants' Motions to Suppress Evidence

 Defendants submit that the trial court erred in denying their motion to suppress evidence, but they utterly fail to set forth the circumstances of the searches or which items of evidence should be suppressed. The transcript of the suppression hearing was not made a part of the record. In conclusory statements the defendants indicate in their brief that they had a possessory interest in the premises searched and constructive possession of the items seized. These standing theories appear to be based on the Government's allegations that they were members of the conspiracy; but they show no individual interest in any of the premises; and they draw no distinction between the defendants who were members of the Family's inner circle and those defendants who conspired with the core members. The defendants rely on *Brown v. United States,* 411 U.S. 223, 230 n.4, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), for their constructive possession theory. In *Brown* the Supreme Court characterized a similar theory as doubtful before rejecting it on other grounds. We shall not adopt it in this case. We find no error in the trial court's denial of the defendants' motion to suppress.

## VI. Fifth Amendment Claims of Unindicted Co-conspirators

During the defendant Davidson's case, the defense called unindicted co-conspirators Garland Jeffers and Cecelia Willis as witnesses for the defense. Counsel informed the court outside the presence of the jury that the witnesses' attorneys had instructed them to refuse to testify and claim their Fifth Amendment privilege. The defense desired to call the witnesses before the jury to assert their Fifth Amendment rights, but the trial court would not allow this. Jeffers and Willis were called outside the presence of the jury, and both indicated their intention to refuse to testify when questioned by the court.

■ On this appeal the defendants maintain their position that they should have been allowed to call the witnesses before the jury, but they concede that the circuits which have ruled on this issue have ruled to the contrary. *United States v. Johnson,* 488 F.2d 1206 (1st Cir. 1973); *United States v. Beye,* 445 F.2d 1037 (9th Cir. 1971); *Bowles v. United States,* 142 U.S.App.D.C. 26, 439 F.2d 536 (1970) (en banc), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971). The trial court correctly applied the law by not allowing the witnesses to claim the privilege in front of the jury. The defendants have no right to have the jury draw inferences from the witnesses' exercise of this right.

■ On this appeal the defendants argue that the court erred by not exploring the basis of the witnesses' claims of privilege outside the presence of the jury to determine if the witnesses' fear was well-founded. At trial no one challenged the legitimacy of the witnesses' fear of self-incrimination or indicated that the claim had to be evaluated on a question by question basis. The trial judge noted that one of the witnesses had a case pending and was going to trial and that the other had an appeal pending. It is clear that a judge in determining the reasonableness of a claim of privilege may take into account facts which are not actually in evidence. *Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). The defendants can hardly claim that the trial judge did not have substantial background information on which to base his evaluation of the self-incrimination claims in light of their claims that he should have disqualified himself because of his extensive knowledge of the Family's activities obtained during other trials. See Part XI *infra.* Under these circumstances, the trial judge did not err by accepting the claims of privilege without a hearing.

### VII. References to Earlier Convictions

The defendants argue that the trial court erred in not granting a mistrial when the Government's first witness made certain statements which the defendants argue were improper. Before trial the court ruled that the Government could not bring up the verdict in the Lafayette trial unless the defense opened the door. During the discussion which preceded the entry of the court's order, the Government indicated that it had no intention of attempting to introduce in its case in chief the convictions in Lafayette but noted the problem that some of its witnesses were not Government agents who could be instructed not to mention certain things. The Government indicated that it would attempt to avoid getting into areas concerning people being in jail and similar references as to dates but that if defendants objected to such questioning, all it could do was to ask a broad question. The judge noted some doubts as to whether Lafayette could be kept out of the case but indicated that he would do the best he could "consistent with [his] obligations." During the testimony of Isaac Davis, the first witness called by the Government, Government counsel asked:

Q. Now, did there come an occasion when you were in Chicago with Garland Jeffers after March of 1974, that you were present during a conversation between Garland Jeffers after March of 1974, that you were present during a conversation between Garland Jeffers and Tyrone Harris?

A. Yes, sir.

Q. At that conversation who all was present, without saying where it took place?

A. Me, LeRoy Williams and Garland Jeffers, and Richie Dean Jeffers and Herman Harris.

Q. Without relating the details concerning certain individuals, would you relate what Jeffers told Harris concerning The Family itself?

Several objections were interposed, including objections that the questions were leading. The court, after a brief discussion, overruled the objections. Government counsel then asked the witness, "First, Mr. Davis, do you remember the conversation I am referring to?" Counsel for defendant

Davidson then interposed the question: "Could we get a date?" After a brief discussion, the jury was excused and the court discussed the matter at some length with counsel.

The conversation in question took place in Cook County Jail shortly after Garland Jeffers had been convicted, in July of 1974, of conspiracy to distribute narcotics. He had been indicted in March of 1974. Government counsel explained that he was trying by use of leading questions to avoid references to these facts and references to statements made during the conversations which were prejudicial to the defendants. A further objection was made that the conversation occurred after the conspiracy had ended and therefore was inadmissible. The Government indicated that it could show that the conspiracy continued through September of 1974 and that Garland Jeffers continued to give orders from the Cook County Jail. The witness was then brought back into court as was the jury.

The Government questioned the witness about other matters and then returned to the subject of the conversation. Counsel for defendant Davidson objected on the ground of relevancy, on the ground that the declarant and the defendants had not been shown to be members of a conspiracy so as to invoke the co-conspirator exception to the hearsay rule, and on the ground that the statement was a post-conspiracy statement. The court then asked:

The Court: What is the time?

Mr. Van Bokkelen [Government counsel]: After March of 1974.

The Court: What time? Fix the time, Mr. Van Bokkelen.

Mr. Van Bokkelen: Approximately when would this have been?

A. Right after they were convicted, about in July.

The Court: What year?

Mr. Van Bokkelen: What year?

A. 1974.

The court then overruled the objections subject to the answers being connected up. Government counsel then continued:

Q. Now at that time, in reference just to any conversation that may have taken place concerning Family business, what was said at that time in the presence of those people?

A. Well, it was right after they had been convicted in Lafayette, he was telling them about, to keep the business going, certain peoples who had testified against him, he wanted them killed.

After requests from counsel, the jury was excused.

All the defendants joined in a motion for mistrial based on the answer, urging material prejudice to the defendants and violation of the motion *in limine* to exclude reference to the convictions in Lafayette. A lengthy discussion then ensued. The position of Government counsel was that he had done everything he could to avoid the references to the conviction but that it had become difficult with all the objections. He further indicated that he had instructed the witness not to go into this area but that it was difficult since the witness was not an agent; that the reference to killing was in line with other testimony; that the only issue was the mention of convictions; that the statement of the witness indicated little more than what one of the defendants' counsel had indicated in his opening statement; that there was no objection when earlier there was a reference to convictions without the reference to killing; and that the defendants had invited the response by their objections. The position of the defendants was that the answer was prejudicial regardless of the Government's intent and that one counsel's opening statement did not open the door for all. Several of the defendants moved for severance in the alternative to a mistrial. The court indicated that it understood the Government's problem and that it did not think that Government counsel had intentionally or even negligently committed error. The court indicated that it would, nevertheless, strike the answer and admonish the jury to disregard it. It did so.

On this appeal the defendants argue that the trial court erred in not declaring a

mistrial because the evidence solicited was hearsay and was introduced before the fact of a conspiracy was established, because the witness had violated the order of the court to refrain from referring to the Lafayette trial, and because the evidence was of a post-conspiracy statement and hence was inadmissible.

■ The defendants' first two arguments are clearly without merit and require little comment. The order of proof at trial is a matter almost wholly within the discretion of the trial court. The court did not err by allowing testimony to be introduced subject to the establishment of independent facts connecting appellants with a conspiracy. *Nelson v. United States*, 415 F.2d 483 (5th Cir. 1969), *cert. denied*, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970). The pretrial order was directed primarily to the Government, and the trial court did not believe that the Government had committed error. The Government had informed both the court and the defendants that it would have difficulty in controlling the witness unless allowed to ask leading questions and avoid specific references to dates and places, but various defendants persisted in objecting. The Government must work with the witnesses who are available, and the trial court applied its ruling in a practical manner. It did not abuse its discretion in doing so.

■ The defendants' third argument raises a more difficult question.[3] The hearsay rule normally precludes the introduction of out of court statements made by one person as evidence against another; but where a statement is made by one co-conspirator in furtherance of an ongoing conspiracy, it may be introduced as evidence against other conspirators. *Krulewitch v. United States*, 336 U.S. 440, 443, 69 S.Ct. 716, 93 L.Ed. 790 (1949). A statement made after a conspiracy has ended is not admissible. *Id.* at 442, 69 S.Ct. 716. Defendants argue that the conspiracy ended prior to the conversation in July because the last overt

act charged was in June. They argue that in any event Garland Jeffers could no longer have been a part of the conspiracy because he had been arrested, tried, convicted, and was in jail.

■ In *Fiswick v. United States*, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946), the Supreme Court held that statements of certain conspirators were not admissible against others because, even though the indictment charged that the conspiracy continued through the date of the indictment, the last overt act averred and proved occurred before the statements were made. In the present case evidence of overt acts was presented from which the jury could have found that the conspiracy continued through August or September. The question, therefore, is whether the failure to allege such overt acts in the indictment precludes the Government from showing the conspiracy continued beyond the last overt act alleged. We hold that it does not.

■ Evidence of overt acts which occurred after a conspiracy was formed and which were related to the object of the conspiracy is admissible regardless of whether the overt acts are charged in the indictment. *United States v. Clay*, 495 F.2d 700, 706 (7th Cir. 1974), *cert. denied*, 419 U.S. 937, 95 S.Ct. 207, 42 L.Ed.2d 164. Indeed, it has been held that a conviction for conspiracy may rest on proof of an overt act not charged in the indictment. *Brulay v. United States*, 383 F.2d 345, 350–51 (9th Cir. 1967), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478. It is not necessary for the Government to prove each overt act alleged. *United States v. Vittoria*, 284 F.2d 451 (7th Cir. 1960), *overruled as to another ground, United States v. White*, 405 F.2d 838, 848 n.16 (7th Cir. 1969) (en banc), *rev'd on that ground*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 483 (1971). From these principles it is clear that the determination of a conspiracy's duration for purposes of the hearsay exception must depend on what the Government is able to

---

3. Unfortunately, the Government's brief was of little help to the court in resolving this issue as it lacked relevant citations to the points of law it argued. Briefing counsel should not expect this court to do the research counsel should have done.

prove. Statements are not admissible if made after the last overt act proved but before an overt act averred but not proved; statements are admissible if made before the last overt act proved regardless of whether the overt act was averred.

 The question of whether Garland Jeffers remained a conspirator after his arrest still must be answered. It is generally held that once established a partnership in crime continues until fruition or some act is taken to disavow it or to defeat its purpose. *Pinkerton v. United States*, 328 U.S. 640, 646, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). The arrest or incarceration of a conspirator may constitute a withdrawal for a conspirator, but it does not as a matter of law. *United States v. Agueci*, 310 F.2d 817, 838–39 (2d Cir. 1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). The Third Circuit recently faced a similar argument under similar circumstances. In *United States v. Armocida*, 515 F.2d 29 (3d Cir. 1975), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84, the defendants argued that it was improper to allow the introduction of evidence regarding a conversation which took place while the defendant was in jail. The court held that a conspiracy for the purpose of distributing heroin did not necessarily end upon the arrest of co-conspirators. The court relied on statements made by the defendant while in jail to support its conclusion that the conspiracy had not ended. *Id.* at 47. Based on the record as discussed above, we conclude that Garland Jeffers did not disassociate himself from the conspiracy after his arrest and conviction and that therefore evidence of the conversation was properly admitted into evidence.

 Evidence of the Lafayette convictions was not, of course, relevant to the present case; and the trial court acted properly in striking it from the record. The evidence was not so prejudicial, however, as to require a mistrial.

### VIII. Evidence of an Assault on Federal Agents

Overt Act 18 of the indictment read:

On or about the 8th day of February, 1974, in Gary, Indiana, in the Northern District of Indiana, defendant JAMES HILLSMAN and unindicted co-conspirators CLINTON BUSH and JIMMIE MERRITT and others unknown to the Grand Jury assaulted Special Agent Kenneth Rhodes of the Drug Enforcement Administration while the said officer was engaged in the performance of his official duties and in the investigation of the operations of "The Family" organization.

The defendants argue that the trial court erred by not striking this overt act from the indictment, by permitting evidence to be introduced regarding it, and by instructing the jury on the crime of assaulting a federal officer, these instructions compounding the prejudice by unduly highlighting this one overt act. According to the defendants, the evidence did not show that the assault was perpetrated in furtherance of the alleged conspiracy but was introduced to prejudice the defendants by bringing violence before the jury.

 The defendants' legal arguments on this point might have merit if the record did not connect the assault with the conspiracy; but contrary to defendants' protestations, there is ample support in the record on which the jury could have concluded that the assault took place to further the interests of the Family. Special Agent Rhodes of the Drug Enforcement Administration testified that he went to the funeral of VanLott III to do surveillance on the Family. VanLott III had been a member of the Family. Special Agent Munson was there taking pictures with a video camera. Rhodes testified that he directed Munson to leave because he detected a hostile attitude. William Hanyard approached a "gold-looking" car and talked with a person he knew to be a man of status in the Family and whom he later learned to have been Nathaniel Jeffers. Hanyard then went across the street and struck Munson; and according to Rhodes, started to do so again. Rhodes then drew his weapon; and as he was getting into combat position was struck from behind. His weapon fired striking

Hanyard and killing a bystander. According to his testimony, immediately after that he identified himself as a federal agent to anyone within hearing distance and particularly to Nathaniel Jeffers. As Rhodes was driving away, shots were fired at his car. Nathaniel Jeffers was an unindicted co-conspirator in the present case. For a fuller description of the events of this funeral, see *United States v. Hillsman*, 522 F.2d 454 (7th Cir. 1975), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed.2d 410. In light of this testimony, we find that the trial court did not err in permitting the jury to consider the evidence relating to Overt Act 18.

### IX. Cross-examination on Sexual Relationships

 Lois Brown was a witness for the Government. During cross-examination, counsel for defendant Davidson began to question Brown concerning her sister. Government counsel objected, and a discussion concerning the proper scope of cross-examination ensued outside the hearing of the jury. Although he was cross-examining, defendant's counsel made what he termed an offer of proof:

I intend to show that not only was her sister Candy an addict, but the witness was an addict; not only was her sister Candy a prostitute, but the witness was, and further, she and her sister together put on sexual shows. . . .

. . . . .

For the entire period, your Honor, I would like to make an offer to prove that if I were allowed to ask this witness the questions she would answer as follows, that she was and has been continuously a prostitute and a sexual show giver in conjunction with her sister; and she has at one time or another sold herself to almost everybody she has testified with regard to; that in fact, her only and sole connection with this matter in 1973 and 1974 was as a prostitute and procurer of other women, primarily her sister Candy, for various members and people with whom or about who she testified.

The court permitted counsel to explore the witness' addiction but denied him the right to go into the other matters on the grounds that the request went well beyond the scope of Fed.R.Evid. 607, 608, 609, and 408.

On appeal, the defendants urge that the trial court's ruling was incorrect. They argue:

It is important to note that the purpose of the intended cross examination was not to impeach the witness' credibility by showing she participated in such acts, rather appellants were seeking to elicit the defendants' relationship with the witness in order to show the bias of the witness against them, with the consequent effect on the witness' veracity.

Evidence of prior misconduct which did not result in a conviction generally may not be introduced to show a witness' bad character. Such evidence may be introduced for the purpose of showing that a witness has cause to be biased. *United States v. Marzano*, 537 F.2d 257 (7th Cir. 1976). We do not disagree with the cases cited by the defendants which indicate that no special rule applies when the conduct involved is of a sexual nature. *See, e. g., Thompkins v. United States*, 236 A.2d 443, 25 A.L.R.3d 532 (D.C.App.1967). The defendants' position cannot be sustained, however, for two reasons. First, nowhere in the record did anyone indicate that the purpose of introducing the evidence was to show bias. Counsel merely indicated, "It goes to the credibility of the witness." Second, the defendants neither indicated to the trial court nor to us how the witness' prior conduct would create bias. We do not find that a sexual relationship will per se give rise to bias, either favorable or unfavorable. The trial court did not commit error by refusing to allow counsel for defendant Davidson to cross-examine Lois Brown regarding her sexual relationships or other societally undesirable characteristics.

### X. Competency of a Witness to Testify

The defendants argue that Esker Dodson was incompetent to testify as a matter of law and that his testimony should have been stricken. Dodson admitted substantial

use of heroin over a period of years and having had a "fix" within two days of his testimony. After his first day of testimony, Dodson was taken to a hospital to receive medication. The following morning the Government represented that Dodson had received 50 mg. of Demerol. It was later brought out by the defendants that this information was incorrect and that Dodson had received 75 mg. of Demerol and 50 mg. of Phenergon. On multiple occasions the district judge asked Dodson to speak up; and apparently on several occasions during the testimony, Dodson was observed to be bouncing or nodding. Dr. Ziporyn, an expert witness for the defendants, testified that Demerol was for pain relief; that the initial dosage is generally 50 mg. but that it can be raised to 75 mg. or in an extreme case to 100 mg.; that 75 mg. is an acceptable but heavy dosage; that a person who had received the dosages that Dodson had received would at the time he was testifying experience some clouding of consciousness and difficulty in pinpointing accurate thoughts; that it is generally figured that an individual will have difficulty in adequate cerebration for about eighteen hours after receiving such medication; and that an individual's lack of awareness of whether it was January or February, a lack which Dodson had shown, would tend to indicate that there was definite clouding. On cross-examination Dr. Ziporyn admitted that to know the type of effect an individual was having would require actual observation.

In *United States ex rel. Lemon v. Pate*, 427 F.2d 1010 (7th Cir. 1970), this court discussed the question of whether a witness' condition as an addict rendered him incompetent to testify or whether his condition merely went to his credibility. The witness had taken narcotics the day of trial before his testimony. The court held that the witness' condition was a matter of credibility since the witness had appeared alert and the trial judge had the opportunity to observe his physical appearance, manner of articulation, and continuity of testimony. The court emphasized that his testimony was substantially corroborated by the testimony of other witnesses. Counsel had made no request for the court to conduct a hearing on the witness' competence.

■ *Lemon* controls our result in this case. The arguments of the defendants regarding Dodson's competence are largely based on his demeanor. After the first day of Dodson's testimony, a discussion occurred concerning his condition:

Mr. Eisenberg: . . .. This guy is flying now.

Mr. Van Bokkelen: That is your opinion.

Mr. Eisenberg: It is everybody's opinion.

The Court: It is not my opinion.

The facts necessary for the evaluation of the witness' competency were peculiarly within the knowledge of the trial judge. He had the opportunity to observe the witness; we have not. Counsel did not request a hearing regarding the witness' competence; and indeed, the witness' competence does not appear to have been directly challenged before the trial court. Unfortunately, Dodson's testimony was not corroborated to the degree the witness' was in *Lemon*, but this does not necessarily change the result. Dodson's condition was a matter of credibility for evaluation by the jury. There was evidence indicating his addiction and the jury was provided with substantial expert testimony on how to evaluate an addict's testimony, including testimony that an addict's truthfulness or trustworthiness was "zero"; that such a person would be more likely than a nonaddict to lie in return for an offer of immunity, reduction of sentence, dismissal of a pending charge, or real or imagined revenge; that such a person would fabricate a story to achieve his own ends; and that while such a person would remember events which occurred while he was under the influence of narcotics, his impressions of the events might be totally false.

## XI. Disqualification of the Trial Judge

Prior to trial the attorney for defendant Harris moved that the trial judge disqualify himself because other "Family" cases had been tried before him and because he had

made various rulings and comments concerning these trials. The appellants urge that Judge Sharp erred in denying the motion. In addition they urge that Judge Sharp should have disqualified himself because he had examined the presentence reports of defendant Hillsman when he was sentenced for his participation on the substantive offense shown in Overt Act 18 and defendant Richie Dean Jeffers when she was before him on an unrelated matter.

■ In *United States v. Jeffers, supra,* 532 F.2d 1101, this court rejected an almost identical argument regarding earlier trials when it was raised by Garland Jeffers. We need not lengthen this opinion by discussing the issue again at this time other than to reaffirm that a judge's exposure to evidence presented at an earlier trial involving the same person does not per se create the kind of bias or prejudice which requires disqualification.

■ The question of the presentence reports was not present in *Jeffers.* The issue does not appear to have been presented to the trial court, so this court might properly consider the issue waived. We have, nevertheless, considered it and find defendants' argument without merit.

The defendants rely on *Gregg v. United States,* 394 U.S. 489, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969), and *United States v. Small,* 472 F.2d 818 (3d Cir. 1972). In *Gregg* the Supreme Court held that submission of a presentence report to the court before the time specified in Fed.R.Crim.P. 32 is error of the clearest kind. The Court did not reverse the defendant's conviction in the case because there was no direct evidence that the judge had read the presentence report before the jury returned its verdict and because the judge did not communicate with the jury after it had received the report, the jury having already retired. The strict terms of the rule were not violated in this case. Rule 32(c)(1) provides that the report shall not be submitted to the court unless the defendant has pleaded guilty or nolo contendere or has been found guilty. There is no evidence indicating that the trial judge saw the reports before the

defendants had been convicted in the prior cases; that is not the defendants' argument. They argue that the trial judge's knowledge of the reports is sufficient to disqualify him.

In *Small* the Third Circuit discussed this possibility. It did not decide the issue but reversed on other grounds. It noted that in *Gregg* the Supreme Court was not considering the retrial context or similar circumstances when a judge might see a presentence report before trying a defendant. One factor in the Supreme Court's reasoning in *Gregg* was that there was no reason for the trial court to see the report before the occasion to sentence arises.

*Gregg* does not require reversal in this case. Rule 32 has not been violated so the defendants cannot claim its benefits. Reversal would only be required if their trial offended due process or federal statute. In similar contexts, this court and others have held that trial by a judge with knowledge of a presentence report is not cause for reversal. *United States v. Crovedi,* 467 F.2d 1032, 1038 (7th Cir. 1972), *cert. denied,* 410 U.S. 990, 93 S.Ct. 1510, 36 L.Ed.2d 189 (1973); *United States v. Foddrell,* 523 F.2d 86 (2d Cir. 1975), *cert. denied,* 423 U.S. 950, 96 S.Ct. 370, 46 L.Ed.2d 286 (1976).

## XII. Sufficiency of the Evidence Against Patterson and Bullock

Defendant Patterson argues that the court erred in denying his motions for judgment of acquittal, which he made at several points during the trial, because the Government did not introduce sufficient evidence to sustain a conviction. Defendant Bullock also challenges the sufficiency of the evidence against him. The other defendants do not challenge the sufficiency of the evidence.

■ This court must sustain the jury's verdict if there was substantial evidence, taking the view most favorable to the Government, to support it. This court need not determine whether the evidence establishes guilt beyond a reasonable doubt but only must determine whether the evidence

would permit the triers of fact to find the defendant guilty beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

At the close of the Government's case in chief, the court indicated that a jury question had been presented against all the defendants except possibly Patterson and Bullock and requested an oral summary of the evidence against them. After some discussion, the court denied the motions of all the defendants except Patterson and took Patterson's motion under advisement overnight. The next morning, relying on language from *United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975), the court overruled Patterson's motion.

■ Patterson argues that the trial judge applied too lax a standard, relying on *Braasch*, and allowed the case to go to the jury on evidence which was insufficient for it to find guilt beyond a reasonable doubt. In *Braasch* this court stated: "[O]nce the conspiracy was established—the evidence of which was overwhelming—slight evidence is sufficient to connect a particular participant." 505 F.2d at 148. Language similar to this appears in many cases; but it should not be construed to mean that once a conspiracy has been established, the evidence needed to sustain a jury verdict or to present a jury question regarding an individual's participation in a conspiracy is any less than that needed to uphold a jury's finding that a person participated in any other crime. Perhaps the best exposition of the doctrine as this panel understands it appears in *Phelps v. United States*, 160 F.2d 858, 867–68 (8th Cir. 1947), *cert. denied*, 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780 (1948):

> Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so naturally into position in the fagot as to convince that it is part of it. It is therefore possible for the circumstances on an individual defendant's participation in an established conspiracy to become substantial from their weight in position and context, though in abstraction they may seem only slight.

■ We have examined the evidence against both Patterson and Bullock. The evidence against Bullock was stronger than that against Patterson, but it was sufficient against both. Neither challenges the sufficiency of the evidence showing the existence of the Family conspiracy. Each urges that he was not sufficiently connected with the conspiracy. Esker Dodson testified that in June 1973, one evening he went to Clayman's Lounge at Garland Jeffers' request to pick up a package of narcotics from Bullock and Patterson. When he got there Patterson argued about whether to give the package to Dodson, expressing doubt about whether they could trust Dodson. Eventually, Bullock gave Dodson the package. Dodson delivered the package to others, and a few days later Bullock accused him of switching packages. David Brown testified that Patterson and Bullock were present in a car with Garland Jeffers and defendant Davidson while Jeffers talked with Brown concerning whether he knew of anyone dealing in narcotics out of a filling station which was nearby. Brown indicated that Jeffers told him they were going to stick up the filling station because the dude had dope in there. Eulis Andrews testified that Bullock and Patterson were present in a backroom at Garland Jeffers' birthday party while LeRoy Williams told Jeffers of a deal he had made to trade heroin for quinine, an ingredient which is difficult to obtain and which is used to cut heroin. Henry Harris testified that in February 1974, at Clayman's Lounge, Garland Jeffers accused him of dealing in drugs without paying the Family. Some discussion ensued between Harris, Jeffers, and defendant Davidson, who was with Jeffers. Harris then returned to his table, but about five minutes later defendant McKinnie approached him and asked if he had straightened things out with Jeffers. Harris responded that he had as far as he was concerned, and McKinnie said that he better make sure. McKinnie then told him that

Jeffers wanted to talk with him outside. Harris testified that he went outside and found Jeffers, Davidson, McKinnie, Patterson, and Bullock. A discussion then took place concerning Harris' narcotics transactions and obtaining drugs. Jeffers, Davidson, and Harris did most of the talking, although Bullock made some remark about not worrying, that they would get the drugs. Harris also testified that in 1972 he entered the Sugar Hill Pool Hall and saw McKinnie and Patterson. They asked him if he had seen Garland Jeffers, but he had not. He then asked them for ten dollars, but they indicated that they did not have it then. Nathaniel Jeffers came in and Patterson and McKinnie went to the back of the pool room with him. When they came out, McKinnie handed Harris ten dollars. Harris' testimony was stricken as to Patterson, as discussed in Part II, *supra*, but not as to Bullock. Later, however, on cross-examination Harris again testified that Patterson was present at the Clayman's Lounge discussion outside. Robert Gant, a Gary police officer called as a witness by Bullock, also testified that he saw Harris talking with Davidson, Jeffers, Patterson, and Bullock outside Clayman's. Other witnesses also testified concerning Bullock's involvement.

Several of these incidents show only Patterson's or Bullock's presence while the Family's business was being discussed. It is often stated that mere presence is not sufficient to show participation in a conspiracy; but in this case there is evidence of active participation. The other conspirators' willingness to discuss illegal activities in their presence, knowing they were police officers, is also to some extent indicative of their participation. We conclude that this is a case in which "the stick fits so naturally into position in the fagot as to convince that it is part of it."

## XIII. Cross-examination of Patterson and Bullock

Patterson was called as a witness by defendant Bullock. He denied his presence at the times and places charged by the Government. On cross-examination he was questioned regarding whether he was an employee of Garland Jeffers or whether he had received money from various persons. Counsel for Bullock objected to this questioning on the ground that it was outside the scope of the direct examination. Bullock, after testifying in his own behalf, was cross-examined in a similar manner. After all the evidence was complete and just before closing arguments, a motion for mistrial was made by counsel for Bullock and joined in by counsel for Patterson. The motion was made on the ground that the questions regarding payments were improper and prejudicial in view of the fact that the persons who the questions implied made the payments were not available to testify and substantiate the implications. Garland Jeffers had been convicted of conspiracy, that conviction was on appeal, and he was awaiting trial on other charges. Another witness had been killed several months prior to trial. Another had signed a plea agreement which included a provision that no cooperation with the Government would be required. Bullock and Patterson argue that the trial court erred in denying the motion for mistrial.

The Government argues that it could not have introduced evidence contradicting the witnesses because the questions were asked to impeach them. Such questions, the Government argues, were collateral; and, therefore, the Government was bound by the witnesses' answers and could not introduce evidence contradicting them. We find this argument to be without merit. It is within the discretion of the trial court to allow a witness to be cross-examined on matters which are collateral. 3A J. Wigmore, Evidence § 1006, at 978 (Chad.Rev. 1970). Under the traditional rule, a witness may not be impeached by contradiction on collateral matters elicited on cross-examination. *United States v. Lambert,* 463 F.2d 552, 557 (7th Cir. 1972). A matter is collateral if the fact could not be shown in evidence for any purpose independent of the

contradiction. *Id.*[4] There can be no question that the Government would have been entitled to show that Bullock and Patterson received payments from members of the Family. The question of whether the trial court's ruling was correct on some other basis remains.

■■■■ It is improper conduct for the Government to ask a question which implies a factual predicate which the examiner knows he cannot support by evidence or for which he has no reason to believe that there is a foundation of truth. ABA Standards Relating to the Administration of Criminal Justice: The Prosecution Function § 5.7(d); 6 J. Wigmore, Evidence § 1808, at 276 (3d ed. 1940). In certain cases the Government has a duty to introduce evidence showing the factual predicate if the answer of the witness is unfavorable. For example, in *United States v. Bohle,* 445 F.2d 54, 73–74 (7th Cir. 1971), this court referred to cases holding that when an attorney lays a foundation by asking a witness about prior inconsistent statements, it is reversible error to fail to produce the person to whom the statement was made if the witness denies making the statement. Similarly, it has been held that a witness may not be cross-examined regarding prior convictions if the examiner does not have a certified record of the conviction available to rebut a denial of the conviction. *State v. Williams,* 297 Minn. 76, 210 N.W.2d 21 (1973); *cf. Ciravolo v. United States,* 384 F.2d 54 (1st Cir. 1967). Finally, it has been held improper to ask inflammatory questions where it was agreed by the Government that the matters which the questions implied would not be introduced into evidence. *Richardson v. United States,* 150 F.2d 58 (6th Cir. 1945). On the other hand, cross-examination has sometimes been permitted where evidence is available but where counsel has no present intention of introducing it or where counsel has no factual foundation but a reasonable suspicion that the circumstances might be true. *Hazel v. United States,* 319

A.2d 136 (D.C.App.1974) (The accused was the source of the information but counsel had no intention of calling him to the stand); *United States v. Pugh,* 141 U.S. App.D.C. 68, 436 F.2d 222 (1970) (The witness had testified that he was going to visit a male when robbed; on cross-examination he was asked, on mere reasonable suspicion, if he was not actually going to see a female). That under the traditional rule courts may permit inquiry into collateral matters on cross-examination even though the examiner will be "bound by the answer" implies that the examiner does not have a duty in every case to introduce the factual predicate for his question.

In this case the defendants' counsel did not object and challenge the existence of a factual predicate for the Government's questions. In *United States v. Goff,* 430 F.2d 396 (7th Cir. 1970), this court held that it was not plain error for the Government to have asked questions which implied that a witness had lied to a Government agent and not to have called the agent in rebuttal to establish the basis for the question, even though the Government conceded that the questions were improper. In *State v. Smith,* 228 N.W.2d 111 (Iowa 1975), the Iowa Supreme Court affirmed a conviction where without objection the prosecutor asked the defendant whether he had ever been convicted of a felony, which the defendant denied; questioned him about time served, which the defendant explained was for a misdemeanor; and introduced no evidence rebutting the defendant's denial. In *People v. Lewis,* 180 Colo. 423, 506 P.2d 125 (1973) (en banc), the prosecutor asked a witness if he had been convicted of aggravated robbery and carrying a concealed weapon, which the witness denied. On appeal the defendant argued that this was error because the prosecutor did not attempt to prove that this denial was untrue. The court held that it would not impute bad faith to the prosecutor in the circumstances of that case, particularly in light of a bench

---

**4.** *But see* 3 J. Weinstein, Evidence ¶ 607[05] (1975), advocating that under the Federal Rules of Evidence, the standards of Rule 403 should be applied to determine whether to allow evidence to be introduced showing contradiction rather than applying the traditional test.

**1308**

conference prior to the questioning, the contents of which were not disclosed.

■ On the facts of the case before us, we shall not impute bad faith to the Government. The questions did not imply the type of conduct which the courts have held is so prejudicial that the prosecutor must not only have evidence available before asking but must also actually introduce that evidence if the witness denies the conduct. Had the defendants raised the issue when the Government asked the questions regarding the payments, it would have been within the trial court's discretion to require assurances from the Government either that a factual predicate for the questions existed or that it would introduce evidence showing the predicate if the witness answered in the negative. The defendants argue that certain witnesses could not have been required to testify, but the witnesses could have testified voluntarily or other witnesses might have been present at the time the payoffs were made.

■ In response to the arguments of the defendants regarding the cross-examination of Bullock and Patterson, the Government states that the defendants appear to be arguing that it had no factual basis for the questions it asked the witnesses and, in effect, to be challenging the Government's good faith. To show its good faith, the Government cites materials it included in its appendix showing the factual basis for its questions. The materials are not part of the record in this case. They are excerpts from the transcripts of another trial, are not properly before this court, and should not have been presented to us in the appendix. Nevertheless, because no challenge was made to the Government's good faith in the trial court we will assume that the Government was acting in good faith. We have not considered the appendix materials.

### XIV. Final Argument of the Government Against Patterson

During closing arguments counsel for the Government, in discussing the evidence against the police officers, summarized the testimony of Henry Harris:

Henry Harris testified that approximately February 23, 1974 he had an argument with Garland Jeffers and the Defendant William Douglas Davidson inside Clayman's Lounge concerning Harris' continued dealing of narcotics in the Gary area without paying protection to the Family. Later on outside he was approached by Garland Jeffers, Doug Davidson, Nathan McKinnie and David Bullock requesting that Harris set up a dealer in narcotics so that he could be robbed. On cross examination it was further established that Gerald Patterson was present throughout the conversation outside Clayman's Lounge.

. . . Police officer Robert Gant called by the defendants said that he observed both Bullock and Patterson outside Clayman's Lounge when he went to check to see if Hank Harris was all right.

Somewhat later in the argument, Government counsel stated:

Hank Harris also testified that Patterson and McKinnie met with Nathaniel Jeffers in the back room of the Sugar Hill Pool Hall and although McKinnie had no money when he went in, when he came out McKinnie gave Hank Harris the money that he, Hank Harris, had requested before.

As discussed in connection with the sufficiency of the evidence against the police officers, Part XII, *supra,* and in connection with the administration of the Jencks Act, Part II, *supra,* Henry Harris' testimony was struck with respect to defendant Patterson. Patterson moved for mistrial on the basis of the two references to Harris' testimony, emphasizing the latter reference in his argument. The court took the motion under advisement and ruled against Patterson about a month later, after considering memoranda filed by the parties. Patterson made no motion to have the jury instructed to disregard these remarks.

■ It is elementary that prejudicial excursions outside the record by the Government in closing argument may require reversal of any conviction obtained. *United*

*States v. Fearns,* 501 F.2d 486 (7th Cir. 1974). This is no less true when evidence is admitted and struck than when no evidence is introduced.

■ The Government in closing argument carefully avoided reference to the struck testimony regarding the Clayman's Lounge incident. The court struck Harris' testimony prior to the cross-examination showing Patterson's presence. That testimony was never struck. Had the original testimony been struck because of some characteristic inherent in it, *e. g.,* because it was unduly prejudicial, we might hold that the Government had violated the spirit of the court's order; but the testimony was not struck for such a reason. The Government was merely prohibited from introducing the evidence because, according to the trial court, the Government failed to comply with the Jencks Act. Since another party introduced the same evidence, the Government was entitled to use it. In any event, it is difficult to see how Patterson could have been prejudiced by this reference in the light of officer Gant's testimony. Part XII, *supra.*

■ The second reference presents a more difficult question. The language of the court in striking the testimony of Harris with respect to Patterson by its terms covered all the testimony which Harris had given theretofore regarding Patterson:

> Ladies and Gentlemen of the Jury, you are admonished and instructed that the testimony of the witness Henry Harris as to the Defendant Gerald Patterson has been stricken by the Court, and you are instructed and admonished that you may not consider the evidence of the Witness Henry Harris as against the Defendant Gerald Patterson.

The Government argues that notwithstanding this language, the ruling only applied to the testimony regarding the Clayman's Lounge incident. The court's precise thinking in striking the testimony is unclear. The Government agent who interviewed Harris testified that he took notes when interviewing Harris, utilized them for asking questions before a court reporter, and

destroyed them after they were incorporated into the formal statement. He indicated that to the best of his recollection he neither showed Harris the notes nor read them to him. Harris testified that he had read some of the notes of the agent and that the statements he had given regarding Patterson and Bullock at Clayman's Lounge were not embodied in the formal statement. Because the court gave no reasons in denying the motion for mistrial, we cannot know its rationale. The Government might have been correct in its assumption that the order only applied to Harris' testimony, the trial court may have re-evaluated the scope of its order, or it may have believed that Patterson suffered no prejudice as a result of the Government counsel's statement. At most the evidence showed that the Government was negligent in not incorporating a portion of the agent's notes into the formal statement or in not preserving the notes. Because defendant's rights would have been adequately protected by a more narrowly drawn order referring only to the Clayman's Lounge incident, we do not believe that the court abused its discretion by interpreting its order narrowly.

By our conclusion we do not mean to condone the conduct of the Government in skating on the edge of a violation of the terms of the court's order. The matter was a discretionary one with the court and the situation a close one which could have gone the other way but does not mandate a reversal because of the direction the ruling on the motion for a mistrial did take.

*XV. Cross-examination by Bullock*

During cross-examination by counsel for defendant McKinnie, Dodson testified:

> Q. I said me and Colby Howard [a Gary police officer] had talked about the guys that killed my cousin, and he asked me would I be willing to testify against those guys and against the Family, and I told him I would be glad to.

. . . .

> Q. Did Nathan McKinnie kill your cousin?

A. No, he didn't, I don't think so.

Counsel for the Government then asked for a discussion outside the presence of the jury. The prosecuting attorney indicated that he had no objection to the present line of questioning but that he thought it presented problems. He indicated that Dodson's cousin had been one of the unindicted co-conspirators in this case and that Dodson thought he knew who killed him. He indicated that the reason for making the statement was that he thought counsel might be inadvertently going into the area.

On cross-examination by counsel for defendant Bullock, the subject again was raised:

Q. All right. There is another matter I wanted to talk to you about, if I could, Mr. Dodson, and that is that you had indicated that your reason for testifying here was because your cousin had been killed?

A. That's right.

Q. Now, you know that the Defendant, Mr. Bullock that I represent didn't kill your cousin?

A. Wait a minute. They told me not to discuss that. How would I go about doing that?

After it was established that he had been given the instruction by the Government, an instruction which the court held was proper, a conference took place outside the presence of the jury and the witness. The court asked counsel for defendant Bullock why he was reopening the door which had been closed. Counsel indicated that although he probably would not have mentioned the subject, once counsel for defendant McKinnie had questioned the witness regarding whether McKinnie had killed Dodson's cousin, he felt obligated to ask the same questions. VanBokkelen indicated that he would be more than happy to instruct the witness to answer the question but that it raised problems in this case. He cited *United States v. Ostrowsky*, 501 F.2d 318 (7th Cir. 1974), in which this court held that it was error for the Government to have gone into the details of a murder in a prosecution under the Dyer Act, 18 U.S.C.

§ 2313, and for conspiracy, even though the murder was entwined with the crime charged. He indicated that if each of the defendants pursued that line of questioning, one was going to get an answer he did not desire. It was later established that the witness believed one of the defendants killed his cousin, although he did not have personal knowledge of that fact. After a lengthy discussion and an opportunity for the defendants and their counsel to confer, no agreement could be reached. The court determined that in its judgment the best way to prevent prejudice was to bar any further discussion of the issue and instruct the jury that the references to an alleged killing were not evidence in the case and could not be considered for any purpose whatsoever. This was done. On appeal Bullock argues that it was error for the court to prohibit Dodson from responding to his question.

■ The defendant is, of course, correct that he has a right to subject each witness to searching cross-examination on appropriate subjects, *see Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); nevertheless, it oversimplifies the problem substantially to say that limiting cross-examination relating to the motivation of a witness and preventing the presentation of evidence favorable to an accused is reversible error. Everyone appears to agree that it would have been better if no mention of the killing had been made. The Government, it appears, could have connected the killing with the conspiracy and charged it as an overt act; but it did not do so for fear of prejudicing the jury. The Government was also very candid in warning counsel when the subject was raised inadvertently. The trial court has a responsibility to exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. The trial court acted reasonably to prevent prejudice in this case. Dodson did not indicate that any of the present defendants killed anyone, and the jury was clearly aware that there were other Family members not on trial in the present case. A

defendant has a right to a fair trial, not a perfect trial. Defendant Bullock was not denied a fair trial in this case in the present respect.

## XVI. Severance of Bullock and Davidson

Defendants Davidson and Bullock argue that the trial court erred in denying their motions for severance. Davidson filed a motion for severance prior to trial, which the court denied. Four days before the end of the trial, Davidson filed a supplemental motion for severance and attached an affidavit of Richie Dean Jeffers, one of Davidson's co-defendants. The motion indicated defendant Davidson's desire to call Richie Dean Jeffers as a witness in his behalf. The affidavit indicated that it was not Richie Jeffers' intention to testify on the advice of counsel but that if she were able to, she would testify that Garland Jeffers (her husband) and Davidson became close friends while in prison, that she and her husband socialized on infrequent occasions with Davidson and his girlfriend, that on these occasions there was never a discussion related to any drug conspiracy, that she had never seen Davidson with large sums of money, and that Garland Jeffers did not approve of Davidson's drug habit. The affidavit expressed her willingness to testify in a separate trial. The trial court denied the motion to sever. Richie Dean Jeffers was ultimately acquitted by the jury. Davidson's theory was that this testimony would explain Davidson's association with Garland Jeffers, who the evidence indicated was the leader of the conspiracy.

Prior to trial defendant Bullock filed a motion to sever. In the motion, after discussing the breadth of the indictment, he indicated that he had not been informed of the exact nature of his alleged participation in the alleged conspiracy; that he was completely without knowledge of the involvement of his co-defendants except for the allegations of overt acts, none of which pertained to him; that he believed that were his co-defendants to testify, they would state that the defendant had no knowledge of or participation in the con-

spiracy or, at a minimum, that they had no knowledge of any involvement by him; and that he was informed many of the co-defendants would not testify, depriving him of any such exculpatory statements. Further he averred that to require him, as a police officer, to stand trial with his co-defendants in this case would be highly prejudicial. This motion was denied. On appeal Bullock argues that he was unable to attach affidavits to this motion because he was unaware of what testimony might be offered against him and therefore what witnesses might be required to refute it. Four days prior to the end of trial, he filed a supplemental motion for severance and an affidavit signed by defendant Davidson and Davidson's attorney. The motion indicated that Bullock desired to call Davidson, who would deny that the conversations about which Henry Harris and David Brown testified took place as alleged by the Government. Harris' and Brown's testimony indicated that Davidson was also present at these conversations. The affidavit supported the motion in these respects and indicated that Davidson was willing to testify in a separate trial but not in the present trial because Davidson's defense was totally inconsistent with that of Bullock. Bullock's motion indicated that he was severely prejudiced by his inability to call Davidson. The district court denied this motion.

On appeal Bullock argues that the motion should have been granted: first, because of his position as a police officer being tried with nine other defendants who assumed positions adverse to him; second, because of the unavailability of his co-defendants and alleged co-conspirators to present exculpatory statements; third, because of the numerous and adverse positions and defenses assumed by the co-defendants; and fourth, because of the numerous statements obtained from co-defendants who were dismissed by the Government or who had entered pleas of guilty in order to secure favorable treatment.

This court summarized the standards for review of a court's denial of a motion for

severance in *United States v. Echeles*, 352 F.2d 892, 896–97 (7th Cir. 1965):

It is to the sound discretion of the trial court that a motion for separate trial is addressed. . . . It is also quite clear that this discretion is subject to review and correction only if abused. . . . The problems arising out of such motions for separate trial frequently confront the courts in conspiracy cases, where the general rule has evolved that persons jointly indicted should be tried together . . . ., particularly so where the indictment charges a conspiracy or a crime which may be proved against all the defendants by the same evidence and which results from the same or a similar series of acts. . . . Nevertheless, a single joint trial, however desirable from the point of view of efficient and expeditious criminal adjudication, may not be had at the expense of a defendant's right to a fundamentally fair trial. . . . What constitutes abuse of discretion in terms of safeguarding each defendant's rights in such cases necessarily depends upon the facts in each particular case. [Citations omitted.]

In *United States v. Tanner*, 471 F.2d 128, 137 (7th Cir. 1972), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220, this court held:

A defendant bears the burden of demonstrating that he has been prejudiced by the joinder; that burden is a difficult one. "The defendant must show something more than the fact that 'a separate trial might offer him a better chance of acquittal.'" . . . Joinder must be shown to have rendered the trial unfair in order to counterbalance the Government's valid interest, as expressed in Rule 14, in avoiding a multiplicity of trials. [Citations and footnote omitted.]

In *United States v. Echeles, supra*, this court found that severance was required because the joint trial was unfair to Echeles. Echeles, an attorney, had represented a defendant in a previous narcotics case. During the narcotics trial a witness admitted perjury and indicated that Echeles

had told him to lie. Echeles' client volunteered several times in open court during the narcotics trial that Echeles had not been a part of the scheme to obtain the perjured testimony. Echeles was nevertheless indicted with his former client for suborning perjury, conspiracy, and impeding the administration of justice. Echeles' former client (and co-defendant) declined to testify in the perjury trial; and although the trial court admitted the inculpatory statements made by the co-defendant during the narcotics trial, the court would not admit the statements exculpating Echeles. Noting the ease with which separate trials could have been granted, this court held that the facts of the case required severance. In *United States v. Shuford*, 454 F.2d 772 (4th Cir. 1971), the Fourth Circuit followed *Echeles*, ordering severance where the key issue in the case was whether the defendant's version of a conversation or the Government witness' version was correct. The only potential witness who could shed further light on the subject was the co-defendant. In so ruling, the court stated, 454 F.2d at 777–78 n. 5:

It is significant that, in this case, severance would only have required two relatively uncomplicated trials in place of one—not an undue burden from the viewpoint of judicial administration. Where severance would necessitate a great number of otherwise unnecessary trials or the duplication of an unusually complex trial, a district court, in the exercise of its discretion, could well consider these factors as possible counterweights to the benefits accruing to the moving defendant from severance in the particular circumstances. . . . The paramount question, however, is always whether refusal of the severance impairs the fairness of the trial.

This court on several occasions where the facts have been less compelling has distinguished *Echeles* on the grounds of the special circumstances in that case. *United States v. Isaacs*, 493 F.2d 1124, 1160 (7th Cir. 1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (Motion made after almost five weeks of trial; complex

case in contrast to *Echeles* ; no representation that the testimony would be forthcoming in a separate trial); *United States v. Kahn*, 381 F.2d 824 (7th Cir. 1967), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (Unsupported possibility that testimony might be forthcoming).

In *United States v. Martinez*, 486 F.2d 15 (5th Cir. 1973), the Fifth Circuit indicated three factors which a court should consider to determine whether depriving one defendant of the opportunity to use the testimony of a co-defendant amounts to prejudice resulting in the denial of a fair trial: First, has the movant shown that the testimony would be exculpatory in effect? Second, has the movant shown to the court's satisfaction that the co-defendant would in fact testify in a separate trial? Third, what is the significance of the desired testimony to the movant's defense; *i. e.,* what is the extent of the potential prejudice to the defendant if tried without the opportunity to elicit the co-defendant's testimony? *Id.* at 22. We think the court should also consider the timeliness of the request for severance and the complexity of the case.

We conclude that the trial court did not abuse its discretion in denying severance to Bullock and Davidson. Clearly Bullock's status as a police officer does not entitle him to a separate trial. The question of testimony by co-defendants, raised by both Bullock and Davidson, is the most difficult question regarding severance; but considering the factors and cases discussed above, we conclude the trial court's decision must be affirmed. Hostility or conflict between defendants is not sufficient to require severance, and the parties have never explained how their defenses are mutually exclusive or conflict. *United States v. Hutul*, 416 F.2d 607, 620 (7th Cir. 1969), *cert. denied*, 396 U.S. 1007, 1012, 1024, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970). Finally, favorable treatment granted to witnesses by the Government in return for their testimony may present a basis for challenging a witness' credibility, but it does not present a basis for severance.

Defendant Bullock also argues on appeal, apparently as an additional reason why severance should have been granted, that he was not permitted to call LeRoy Williams and Garland Jeffers because counsel knew that they would claim their Fifth Amendment privilege. How severance would have remedied this situation is unclear. To the extent Bullock is arguing that the trial court's ruling in this regard was error, that argument must be rejected for the reasons indicated in Part VI of this opinion.

### XVII. Davidson's Claim of Double Jeopardy

Defendant Davidson was first indicted on March 18, 1974. That cause proceeded to trial in Lafayette on June 17, 1974. Shortly after a jury had been impaneled and the trial had begun, Davidson was severed on his own motion due to illness. On September 25, 1974, Davidson was reindicted along with the other defendants in the present case. The Government and the defendant agree that the second indictment charges the same offense as the earlier one. Davidson does not argue that he could not have been tried under the earlier indictment in a new trial, but argues: "[W]here a second trial is constitutionally permissible, the accused must be retried under the same indictment as was originally returned, unless for some reason the indictment under which he was first placed in jeopardy is fatally defective." The exception for defective indictments in the rule proposed by Davidson prevents the rule from conflicting with *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), which held that on the circumstances in that case the double jeopardy clause did not prevent the defendant from being reindicted and retried after a motion for mistrial had been granted on the State's motion because the original indictment was deficient on its face.

The Government and Davidson agree that jeopardy had attached in the earlier proceeding. If a mistrial is declared without a defendant's request or consent, then the question of whether under the double jeopardy clause there can be a new

trial depends on whether there is a manifest necessity for the mistrial or the ends of public justice would otherwise be defeated. *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976). In this case both parties agree that Davidson was severed at his request. This severance is equivalent to a mistrial having been declared at Davidson's request. In *Dinitz* the Court distinguished such a case, holding in language adopted from the plurality opinion of an earlier case: "[W]here circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." *Id* at 607.

No court of appeals appears to have addressed the precise issue presented by this case. *United States v. White,* 524 F.2d 1249 (5th Cir. 1975), is the most closely analogous case which has come to our attention. In *White* defense counsel moved for a psychiatric examination of the defendant after a jury was impaneled but before testimony was heard. The motion was granted. Thereafter the Government filed a superseding indictment under which the defendant was tried and convicted. The Fifth Circuit held that the conviction was not void under the double jeopardy clause. In *United States v. Jamison,* 164 U.S.App.D.C. 300, 505 F.2d 407 (1974), the court rejected the defendant's double jeopardy argument because the defendant had moved for a mistrial but held that the due process clause prohibited the Government from obtaining a valid conviction against the defendant on an indictment for increased charges, because the record did not show the reasons why the increased charges were brought and therefore did not exclude the possibility of prosecutorial vindictiveness. Implicitly the court recognized that reindictment for the same charges would be proper, as would indictment for increased charges if the record showed adequate reasons why the increased charges were brought and these reasons developed subsequent to the original indictment.

We hold that Davidson's retrial and conviction did not violate the double jeopardy clause. Other than the problem presented in *Jamison,* a problem not before us, the Government had the right to obtain a superseding indictment any time prior to Davidson's retrial. The Government's action in this case did not violate any of Davidson's rights; and practically speaking, the Government's action was reasonable under the circumstances. It would have been a poor utilization of both prosecutorial and judicial resources to repeat the lengthy evidence in the earlier case when another group of defendants charged with the same conspiracy were going to trial. While Davidson had an interest in being tried by the original panel seated in the Lafayette case, he lost this right when he moved for severance.

### XVIII. Davidson's Application for Criminal Justice Act Funds

Prior to the trial counsel for defendant Davidson requested funds under 18 U.S.C. § 3006A(e), the Criminal Justice Act, to obtain assistance in preparing Davidson's defense. Section 3006A(e) in relevant part provides:

(1) Upon request.—Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

. . . .

(3) Maximum amounts.—Compensation to be paid to a person for services rendered by him to a person under this subsection, or to be paid to an organization for services rendered by an employee thereof, shall not exceed $300, exclusive

of reimbursement for expenses reasonably incurred, unless payment in excess of that limit is certified by the court, or by the United States magistrate if the services were rendered in connection with a case disposed of entirely before him, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit.

Some of the requests for assistance the court granted; some it denied. On appeal Davidson urges that it was error for the court to deny his requests for a clinical psychologist to assist in jury selection, for an urban sociologist to show that Davidson was not likely to have been accepted into the Family's ruling group, and for an investigative service to develop facts relevant to the defense. Counsel argues that such services are authorized by the Criminal Justice Act but that to the extent they are not, the Constitution requires that they be supplied.

Davidson cites *United States v. Bass,* 477 F.2d 723 (9th Cir. 1973), and the concurring opinion in *United States v. Theriault,* 440 F.2d 713 (5th Cir. 1971), *cert. denied,* 411 U.S. 984, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973), as stating the proper standard by which to judge requests under the Criminal Justice Act. Both involved requests for psychiatrists. *Bass* simply indicates that the concurring opinion in *Theriault* states the correct standard. The majority in *Theriault* preferred to consider the problems presented under the Criminal Justice Act on a case-by-case basis. Judge Wisdom in concurring expressed the view that the court should provide guidance and indicated that the statute required authorization for defense services when an attorney makes a reasonable request in circumstances in which he would independently engage such services if his client had the financial means to support his defenses. Judge Wisdom noted the limitations on amount contained in the statute in his discussion, but in the present case the defendant was attempting to obtain far more than provided by the statute, at least with respect to the request for investigative assistance. Davidson sought $350.00 per day for thirty to forty-five days plus expenses for investigative services. Judge Wisdom also noted that the Report of the Committee to Implement the Criminal Justice Act distinguished between allowances for investigative services and allowances for other services, such as psychiatrists. The committee recommended that allowances for investigative services should be strictly limited, to the extent possible, to those charges necessary in the strictest sense of the word. 36 F.R.D. 285, 291 (1965). In *Mason v. Arizona,* 504 F.2d 1345 (9th Cir. 1974), *cert. denied,* 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975), a state court defendant sought federal relief on the grounds that he had been denied due process and equal protection because he had not been provided with investigative assistance. The Ninth Circuit upheld the conviction. It indicated that effective assistance of counsel requires the allowance of investigative expenses or appointment of investigative assistants when necessary. Such assistance, according to the court, is not automatically mandatory but depends on the facts and circumstances of a particular case. Counsel must advise the court why it is not practical for him to make the investigation with or without the allowance of expenses. The court noted that at the appellate stage, the inquiry is the same constitutionally as under section 3006A: whether a defendant has established prejudice by clear and convincing evidence. *See Christian v. United States,* 398 F.2d 517 (10th Cir.1968). In determining whether such a showing has been made, the court must consider whether defense counsel made as complete a showing of necessity as could have been reasonably expected of him at the time of the request.

 The court did not err in denying Davidson's requests. While this court is aware of the use of psychologists in a few cases for the purpose of jury selection, this is hardly necessary for an adequate defense or within the contemplation of the act. Davidson has similarly failed to show the necessity for the appointment of an urban

sociologist. At most a sociologist could testify that it would be unlikely for a person such as Davidson to become a leader of an organization such as the Family. Assuming that such evidence would be admissible, it would have little if any relevance on the issue in this case. Defendant has cited no cases in which such evidence has been admitted. In the ex parte hearing on Criminal Justice Act requests, counsel for Davidson made a fairly detailed showing of what subjects he would like investigators to explore. The court did not dispute the relevance of these areas but indicated that it believed the work that was needed was lawyer's work. The judge indicated that counsel for Davidson could use his associates to do this work and that he would recommend that they be compensated for their time. Counsel made no showing of why an attorney could not perform the work needed. The court indicated that if counsel presented something specific that was needed, it was willing to authorize the work. Counsel made one request in response to this statement. The court indicated that it would authorize a subpoena to obtain the information, and this appeared to satisfy counsel. On appeal counsel speculates that investigators might have done a better job of obtaining the information which was sought; but under the circumstances of this case, this does not clearly and convincingly show prejudice so as to require reversal.

## XIX. Effect of Harris' Closing Argument on Davidson

During closing arguments, counsel for defendant Harris stated:

> Do you realize that almost without exception every Government witness put Mr. Given's client, Doug Davidson, almost every place, almost every time everything was happening? That means to me that the Government wants to convict Mr. Davidson a lot, and it also tends to shake the credibility, because no matter what the crime is, it is highly unlikely that any one person is every place all the time, all the meetings, all the sessions.

Counsel for Davidson made a timely motion for mistrial on the ground that this argument misstated the evidence. The trial court denied the motion, and on appeal Davidson argues that this was error.

█ Inaccurate statements of the evidence in closing arguments may constitute reversible error, even though the trial judge has cautioned the jury to rely on their own recollection of evidence. This is especially true where the statement amounts to testimony by counsel which fills a gap in the Government's proof. *See, e. g., United States v. Guajardo-Melendez,* 401 F.2d 35 (7th Cir. 1968). On the other hand, rarely are trials perfect, and improprieties in argument by counsel do not call for a new trial unless they are of a nature as probably to prejudice the defendant and the prejudice is not neutralized by the trial judge before submission of the case to the jury. *United States v. Cortwright,* 528 F.2d 168, 176 (7th Cir. 1975).

█ The statement made in closing argument did not require a mistrial in this case. While this back-door attack on the credibility of the Government witnesses might have been better left unmade, it did not purport to indicate Davidson's guilt but rather indicated that the testimony of the Government witnesses was inherently incredible. The statement did not reveal facts which were not in the record but merely characterized the quantity of testimony in the record. Although the statement is hyperbolic, even Davidson's counsel in another context recognized that "for three weeks, there has been a great deal of testimony in this case about Davidson having a strong leadership position in the organization" and in another portion of his brief on this appeal he stated: "[T]he record of the trial is replete with references to the Defendant's [Davidson's] association with the Family organization. . . ."

█ Further, the area is one in which it appears to us that a trial judge should scan a motion for a mistrial with considerable caution. The situation in which one alleged co-conspirator could bring about a mistrial of another alleged co-conspirator, and co-

defendant, has implicit possibilities of collusion. We do not suggest this was a motivation in the present case but do not eliminate it as a factor for consideration in ruling on a claim of mistrial based upon a co-defendant's misstatements in final argument.

### XX. Relevance of Evidence Offered by Davidson

Davidson attempted to introduce evidence that he had been unable to raise $2,500 to enable him to make bond in this case, that he had filed a pauper's affidavit, that he had never been arrested when the police raided the Family's headquarters, and that Jevita Hobbs, a Government witness, had lied to Government authorities concerning the dates of her birth and marriage. The trial court excluded this evidence, and Davidson argues that this constituted error.

Fed.R.Evid. 401 provides that relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed.R.Evid. 403 provides that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. The district court has broad discretion in evidentiary matters to determine what evidence is relevant and when relevant evidence should be excluded because of the considerations enumerated in Rule 403. On appeal this court will not substitute its judgment for that of the district court but will determine only whether the district court abused its discretion.

In this case the district court did not abuse its discretion. On cross-examination of several of the Government's witnesses, counsel for Davidson elicited testimony that Davidson had received large sums of money. In his case Davidson wanted to introduce circumstantial evidence that he had not received large sums of money, evidence that he had not raised bond money, and his pauper's affidavit. It was within the trial court's discretion to exclude this evidence on the grounds of possible confusion. Davidson's receipt of large sums of money was not a necessary element of the case which the Government undertook to prove. The circumstantial showing of conflicting facts is weak because the sums of money turned over to Davidson were for Family business and not necessarily for his personal use. The only relevance of the conflict would be to argue the inference that if the witness was in error about Davidson receiving large sums of money, the witness might also be in error about Davidson's participation. A similar inference could have been drawn if the court had allowed evidence that Jevita Hobbs had lied to Government authorities concerning the dates of her birth and her marriage; but similarly the district court did not abuse its discretion by refusing to allow the introduction of this collateral issue. For a general discussion of the problems of drawing these types of inferences, see 3 J. Weinstein, Evidence ¶ 607[05] (1975).

The question of Davidson's presence at the Family headquarters at the time of the police raids presents a slightly different issue, but we hold that it was within the trial court's discretion to conclude that the fact was not of sufficient consequence to the determination of the action to be considered relevant.

### XXI. Fairness of the Trial of Harris and Hillsman

Counsel for defendants Harris and Hillsman filed a joint supplemental brief. The brief notes with citations how several of the arguments raised in the consolidated brief relate to them. These arguments were rejected hereinbefore. The essence of these defendants' other arguments is that the record as a whole shows that they were denied their right to trial by jury, that they were denied their right of effective assistance of counsel, that they were denied their right to a public trial, and that they were denied due process.

Resolution of these questions depends on the record as a whole and this court's judgment as to whether these defendants received a fair trial. We hold that the record, including the portions cited by the defendants, does not show they were denied a fair trial as allowed them by the Constitution. It would serve no purpose for us to analyze in this opinion each of the incidents cited by the defendants. The trial as we have said was not perfect but, despite its complexities, was fundamentally fair. The defendants' arguments regarding defense counsel's possible conflicts of interest must be rejected for the reasons discussed in *United States v. Jeffers, supra*, 520 F.2d 1256.

### XXII. Conclusion

This opinion was bound to be protracted if we attempted to address the host of issues presented, and we have chosen to do so. A natural reaction might be that surely amongst such a multitude of issues there must be some error mandating reversal. That could well have been the rationale of the appellants' counsel in bringing these appeals, although as experienced attorneys they are also no doubt aware of the risk of loss of sight of the wheat in a case. Of necessity we have had to discuss the various arguments individually, and on the individual basis we have determined that no cause for reversal exists. Further, however, we have concluded from our examination of the record as a whole that all of the defendants received the fair trial to which each of them was entitled. The trial judge merits substantial credit for his fair and impartial handling of this complex series of cases. The judgments appealed from, for the reasons herein set out, are

Affirmed.