**Myron A. FARBER, Petitioner,**

v.

**Joseph P. JOB, Sheriff of Berber County and John J. Degnan, Attorney General of the State of New Jersey, Respondent.**

**No. 78–1899.**

United States District Court,
D. New Jersey.

Aug. 14, 1978.

Winne, Banta, Rizzi & Harrington, Hackensack, N. J., for petitioner.

Raymond A. Brown, Brown, Vogelman & Brown, Jersey City, N. J., for defendant, Joseph P. Job.

John De Cicco, Deputy Atty. Gen. of New Jersey, Trenton, N. J., for defendant, John J. Degnan.

LACEY, District Judge.

Now, I'm doing so in connection with the following opinion that I'm going to place into the record. At the end of extensive argument this morning and having considered all of the submissions by counsel, I had indicated to counsel that I inclined to the view that petitioner had not been deprived of any essential right, constitutional or otherwise by Judge Arnold. As I indicated, I felt perhaps intuitively, that there was almost what Chief Justice Burger has referred to as a minuet going on. We were moving around, but we were really playing with form rather than with substance.

I happen to have been exposed in my professional career, both as a lawyer and as

a judge and as a prosecutor, to the stead- fastness with which reporters cling to the confidential source information that they have and the absolute position that they assume in connection with their assertion of First Amendment rights. Based upon everything that I've heard here today and everything that I've read and the positions taken by Mr. Farber, even with respect to the location of the manuscript, there is no doubt in my mind as somebody who's been in this world for perhaps all too long, at this point, that Mr. Farber, even if he had an extensive hearing before Judge Arnold, once having been told that he was to turn over the manuscripts would have stood on his First Amendment right in absolutist terms, enforcing what he would regard as a reporter as his right to keep undisclosed what he calls his confidential sources, and undisclosed information.

In any event, inquiry by me of counsel established that this hearing that redundantly we have been hearing so much about, which is alleged was denied by Judge Arnold, would, if it had gone forward, have consisted of nothing substantial. Instead nothing more than Farber testifying on direct examination at least, that he was employed by the New York Times and that he was claiming a First Amendment newspaper reporter's privilege against disclosure of confidential sources and unpublished information.

Having read the materials before me carefully, I can say with confidence that Judge Arnold would be the most surprised man in the United States if anybody were to contend here and now that that information was not before him at the time he made his decision. It's clear to me that he was well aware of the fact that Farber was a reporter, was employed by the New York Times and was making a First Amendment claim of privilege. Indeed, this is precisely why Judge Arnold instead of just directing everything be turned over to Jascalevich and his lawyers, urged a break-out of this Catch 22 dilemma and said "Let me see this in chambers."

Now, what he was suggesting to counsel was "Now look, if you really are telling me the truth, if these really are confidential sources that you're seeking to keep undisclosed and if this really is information that up till now has gone unpublished, then your right to a First Amendment claim is advanced."

Now, very often when an absolutist position is taken by a reporter and incidentally, I don't condemn any of this and I think I've indicated earlier I've participated in these programs and I am simply stating I recognize these positions and it always comes down to what I've labeled earlier here today the "crunch", who gives way? The reporters say "Why should the judge make the decision?" and the judge says "Why should the reporters make the decision?"

I don't think we're ever going to resolve it to the satisfaction of 100 percent of the people involved.

But interestingly, most of the time when the privilege is asserted we don't get the opportunity as we do here to test whether the reporter is being truthful as to why he is seeking to maintain undisclosed his files and his records. Usually we are told that the invocation of the First Amendment is sacrosanct and that as a reporter, I can't permit you to look at these files and that's the end of the matter. Here, however, the window does exist and it can be peered through and we do see something other than has been urged before several judges in this State and in New York, Judge Rothwax and the Appellate Division there and Justices Marshall and White and, indeed, I include myself in that group of people on the bench who were misled by the submissions.

Ironically, were Judge Arnold to have this matter before him now he would have Mr. Jascalevich's counsel to explore on cross-examination of Farber, who would be tendered as a witness by Mr. Scheiman under the offer of proof that he gave me here today, that he said he would have made if given the opportunity to do so before Judge Arnold, a great deal more information which has been developed since

Judge Arnold first took the action about which the petitioner complains.

Thus Judge Arnold now would be able to consider whether in fact Farber's claims that he was protecting sources which were "confidential" and information which was "unpublished" were in fact so. Everything leads to the conclusion, and I so find, that Farber was inaccurate and misleading and fabricating in his submission to Judge Arnold and every other judge, including Justices White and Marshall. This stems from the documentation received by this Court from the respondent in this proceeding, a proceeding initiated by the petitioner himself.

It is clear that Farber, having succeeded in getting the Bergen County Prosecutor to reopen the Jascalevich investigation, proclaimed, not admitted, but proclaimed, that he had done so. Thus you would assume that he had a stake in the prosecution. It now appears that he had long planned to profit financially from his endeavor.

This lady who testified here this afternoon bears witness to that, which is also advanced by the contents of the documentation. She was peddling a book, having been retained by him at or shortly after the time that, through Farber's efforts, the bodies of five people had been exhumed, although no written contract between them was produced.

Even before, as I put this chronologically together, the grand jury proceedings were completed, she was negotiating for this in soft cover, if I finally have this straightened out in my mind, the soft cover rights to this book. She goes to Doubleday and they're not interested. Their April letter so declares.

Then an indictment is returned, an indictment once again for which Farber takes credit for having generated. Lo and behold, Doubleday reverses its position and now agrees to do the publishing work. $75,000 is to go to Mr. Farber. On the execution of the contract, in July, he gets $37,500, and not one judge is told about this throughout the course of these proceedings. Instead, this is a man who is standing, sack

cloth and ashes, firmly on the First Amendment, pristine, claiming the freedom of the press and nobody really knows that he stands, if things go, as I find he was hoping they would go, to become a very wealthy man.

Now, the shocking thing about this, and I must say that, with all respect to the fact that the lady who testified here was obviously nervous and in a new experience as a witness, that I, based on my experience in real life, must disagree with her. The shocking thing about it is that Farber's financial success and Doubleday's and Warner's and indeed Miss Kroll's with her 10 percent of Farber's earnings, that all of them are going to be affected very dramatically by what happens to Jascalevich. In an inverse relationship their fortunes rise as his fall. If Jascalevich is acquitted Doubleday and Warner have on their hands nothing more than a reporter's discredited notion that murder was committed.

If, on the other hand, he is convicted then, of course, Farber will come on the scene as not only the author of a book but the great American hero who singlehandedly vindicated the deceased.

Now, none of us here knows whether Jascalevich is innocent or guilty. I am not taking his side nor do I stand against him. I don't care how the case comes out.

On the other hand, I find that Farber does care how the case comes out, that Farber wants Jascalevich to be convicted. That finding is based upon everything that has been submitted to me in this record that we've discussed here today. He wants Jascalevich to be convicted. Why do I say that? Because things being what they are in terms of human affairs he does have a stake, even if only a financial interest, since he early formed the conclusion that murder was here committed.

You'll recall, gentlemen, that I addressed myself to what he called, with his first submissions to Doubleday, the "curare murders." He didn't say having to do with the possibility that a crime may have been committed. He didn't say having to do with

the deaths of people, possibly from curare. He called it the "curare murders." It was he in one of his early articles who quite ungenerously, particularly do I underscore that word now that we know what his financial interests were at the time, who quite ungenerously defamed the former Prosecutor, Guy Calissi, presently a State Court judge, stating that for "inexplicable" reasons the investigation in 1966 had not been completed.

Now, I don't know how you can come any closer than charging someone with malfeasance in office than he did in that case.

Mr. Calissi, now Judge Calissi, had no opportunity to answer that charge. But one wonders what Mr. Calissi would have been able to do at the time had he known of Mr. Farber's stake in the outcome of the investigation.

It is clear to me that if there's an acquittal here this would substantially impair, if not completely destroy, Farber's credibility and reliability as an impartial and detached and objective reporter and author. It follows that Farber has everything to gain by resisting any effort to deliver to Jascalevich and his counsel anything that would further Jascalevich's defense and thereby make more likely an acquittal.

Now, I will address myself to the *Branzburg* argument presented by the petitioner.

Farber, it's clear, was not just any reporter who happened to come upon a discrete piece of information. He was the inspiration for the case. This is not like *Branzburg* where the state is endeavoring to compel a reporter to aid it in its investigation of a crime. The shoe here is on the other foot. Farber has worked shoulder to shoulder with the state.

From all I can gather, and I so find, there would never have been an indictment if he had not intruded himself into the investigation process.

Now, once he did so, even without his thereafter implementing his plan to make vast sums, by revelation and implementation of all he had planned, I have to find that he had perceived and should have perceived that there could well come a day when Jascalevich, whose conviction Farber obviously would welcome, would want to know what Farber had learned in what I think I labeled earlier today his "journalistic ubiquity" as he toured Bergen County, went to Argentina and covered the State of New Jersey.

More particularly, Jascalevich would want to know what in Farber's file would aid his defense.

If we were to put aside the First Amendment, to look at this in terms of plain, common sense, sitting at ease in a lounge in our living room, we would say, "Does the Constitution stand for the proposition that's here being urged by Farber?"

Now, he has never denied in any submission to me that the material that's in his file—I should put it in other words so there's no confusion of words. That the information in his file is material. He's never denied that proposition. He's never said with respect to Judge Arnold's order or Mr. Brown's affidavit "they are wrong. I deny that what I have in my file is material to the case."

I say as an aside that were he to do so one would have to wonder how you could reconcile that denial with all that we have heard here about how "he knows everything about the case" said McCormick of Doubleday. How he has an "obsession" with the case, said by McCormick at Doubleday.

But in any event, he has never taken that position, nor has he ever said "What I have really isn't necessary." He has walked a narrow strip and said instead that "Mr. Brown has not carried his burden."

Carry the burden when Farber has this vast file made up in the way in which we've seen described? When he knows the case from its inception better than anybody involved in it.

What was more plainly an appropriate accommodation of conflicting interest than what was tendered by Judge Arnold in this case? I can see no basis for being critical of what Judge Arnold did. Instead, what he

did can only be described as astute and to be lauded.

Now, Farber's the only one in this entire universe who knows what he has in his files. He's the only one in this entire universe who knows what redundancy there is between his files, on the one hand, and the manuscript, on the other. Consequently, it follows he's the only one who knows whether everything in his files is ultimately incorporated in the manuscript.

Now, I find, based on what I've heard that there are names of persons disclosed in this manuscript, a manuscript I find which will be published as quickly as possible after the trial. Particularly will it be accelerated if there's a conviction. Where then is this great interest in preserving confidential sources?

He doesn't even want to disclose who holds the manuscript. This is an extension of the posture taken by him in March of this year when, and I must presume again, and I find, that he warned Doubleday of the possibility of issuance of subpoena shortly. He participated, along with Kroll in an act which saw Doubleday strip its files of essentially all of the information it had received from Farber. Doubleday, which has received at this point through Part 6B of the book, according to that latest letter of transmittal which we have referred to, actually sent to Kroll a copy of the memo of its lawyer.

Now, this is all as if there was never a trial going on in Bergen County involving a man's life. If he's convicted he faces life imprisonment. So Doubleday's legal counsel, Heather Kilpatrick, which incidentally you have to admit is a nice Irish name, Heather Kilpatrick is writing a memo to her superior saying, "Get these out of here. Get them back to Farber. Advise him to turn them over to his lawyer because then they'll be less vulnerable to subpoena than if left with us."

Her superior, I guess it wasn't her superior, I think it was a Miss Ward, Joan Ward, sends material over to this fellow Howe who works for Miss Kroll. And now they're going to play an interesting game, from now on have the manuscript go to the lawyer. What, is it confidential on the basis now of attorney-client privilege? Jascalevich is a pawn in all of this. So, as the parts come through from now on Kroll's associate Howe is told, "We'll come there and read the manuscript. That way, you know, it won't be in our files and subject to subpoena."

Now, why is Doubleday so interested in all this? Why do they want to be sure that this manuscript is not disclosed? What, Farber's First Amendment right? Let's not kid one another. We know why Doubleday doesn't want premature disclosure of this book just as, gentlemen, we know why Farber doesn't want premature disclosure of this book and Warner doesn't want a premature disclosure of this book, because it will thereby devastate their interests and hopes for the future.

Now, there's another aspect in all of this. In the agreements here you will find fairly inferable from the contracts, Mr. Scheiman, and here we may disagree with our reason, but in the federal courts you don't get much chance to do contract work any more. But, in any event you will find that fairly to be drawn from the Doubleday agreement the fact that if perchance Farber somehow gets information out into the public before that book is published he may be in trouble with Doubleday.

You will also find in that agreement references to the matters we talked about this morning about releases and the warranties he made to Doubleday that nobody's rights are going to be affected. Well, what about all these confidential sources that are running around in the woods that he's telling Judge Arnold he must protect because they have their rights? You then say to me, "Well, you know, that First Amendment claim of a reporter is really the reporter's privilege rather than the confidential source's privilege." And I will concede that there's a powerful argument for that.

But, there's a powerful response to it here and I try to put it in paraphrasing Justice Marshall's response when I refer

you to that portion of the brief that you urged upon me when you came in the other evening.

The portion you urged upon me was Justice Marshall saying that—and I may not quote it precisely, but criminal informants may be reluctant to impart information if they know that their names are going to be disclosed to a judge. This therefore impairs First Amendment functioning. That's what really he's saying and what you're urging me to draw from that observation of Mr. Justice Marshall.

You'll recall the paraphrase that I established. I said let's change that, will criminal informants be affected if they are told that Mr. Farber is going to disclose their names to Doubleday? Let's assume for the moment that he does not use their real names in the book. He still has to give their true names to Doubleday. What, is it less disastrous to the First Amendment protections, to do that, than to permit Judge Arnold to review the papers? It's a ludicrous proposition. It answers itself.

This is a sorry spectacle of a reporter who purported to stand on his reporter's privilege when in fact he was standing on an altar of greed. He misled Judge after Judge with what I'll charitably term his incomplete and inaccurate submissions. What he did here is rendered—I won't even qualify it, is rendered evil by the only conclusion that can be drawn by an observer. That his interest is in seeing Jascalevich convicted just as his principal interest in 1975 and 1976 was in achieving Jascalevich's indictment.

Now I happen to believe in the same principles that your firm stands for in case after case in which you've been involved. I know your firm well, as you know I do. I happen to think that the New York Times is a great newspaper. I'd like to think that in this case Farber misled everybody and that's the impression I want to carry away in my own mind about the stakes that are involved here. Farber in this case leaves the First Amendment a little bit worse for his behavior here. This case adds no luster to First Amendment law. As I said, if you

were to just sit down and talk to a citizen about this matter and you were to explain what was going on here they'd say it could not happen in the United States, that some judge would see through this. But we judges can only function on what we are presented. It wasn't until now that a Judge has been presented with what I saw here in this case.

Those are my findings, gentlemen. That was why I have concluded as I indicated earlier that the bail quickly would be denied; that the underlying issue would have been decided against the petitioner and for that reason I will here and now enter the order granting the application to dismiss the petition.

Thank you very much, gentlemen. Work out your problems with your exhibits. I will supplement these remarks with a brief written memorandum at the time a formal order of dismissal is entered.

### SUPPLEMENT

The foregoing oral opinion was rendered immediately following my decision to permit Farber to withdraw his petition rather than obey my direction to disclose the location of his manuscript. In view of the issues presented, I would have preferred to have prepared a written opinion, but the situation does not afford that luxury. Trial in *State v. Jascalevich* is ongoing and, accordingly, it was, in my view, important to act speedily on Farber's application.

I will, however, in connection with the written order being filed this date supplement with the following my oral opinion of August 12, 1978.

1. This case is distinguishable from *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), in that here there not only were no promises of confidentiality given by Farber to his sources but, if any were given they will have been mitigated or rendered sterile by releases Farber, under his Doubleday contract, will obtain. Moreover, unlike *Branzburg,* Farber became an investigative arm of the state as he and the prosecutor joined forces

against a defendant. Moreover, to the extent Farber stood on his reporter's privilege before Judge Arnold, his support is demolished by his having disclosed all or substantially all of the alleged confidential information and unpublished notes to his literary agent and publishers.* The precise extent of the disclosure is impossible to fix because Farber, notwithstanding my suggestion that complete disclosure must have been made, declined to produce the manuscript at the hearing before me. I can only assume—and the facts at hand support this assumption—that the manuscript reveals in infinite detail Farber's investigative work.

2. Farber's agreement with his literary agent was entered into in early 1976; however, no written contract between them was entered into the record.

3. No publisher was interested in publishing Farber's proposed book until Jascalevich was indicted. Warner, with whom Farber negotiated before the indictment was returned in May, 1976, insisted on inclusion of a clause which conditioned its obligation upon an indictment or other criminal proceeding being instituted against Jascalevich. Farber understandably would not accept such a contingency; he wanted to write a book whether or not Jascalevich was indicted. It was not until the indictment that Doubleday reversed its earlier declination of April 1976 and agreed to publish the book.

4. Farber has a substantial financial interest in Jascalevich's fate. An acquittal might even lead responsible publishers to abandon their publishing plans. Doubleday, Warner and Farber are best served financially by Jascalevich's conviction.

5. This court, it should be noted, does not condemn Farber for writing a book about the Jascalevich matter and his role in, to use his agent's word, having "instigated" the reopening of the investigation. I simply find it incomprehensible that an able and responsible reporter would not understand that he owed the duty to the several

courts in which he has sought relief to reveal that he had embodied in a book, that would be published right after trial (at least, if Jascalevich is convicted), so much, if not all, of the information as to which he was claiming a reporter's privilege and that this book had been given to Doubleday, Warner and his agent, so that his confidentiality claim might be evaluated in that light.

6. Farber was deprived of no fundamental rights by Judge Arnold. His claim of deprivation of hearing is hollow and form without substance. Given an opportunity to enter of record before me what his proofs would have been before Judge Arnold, his attorney simply stated that Farber would have testified he was a reporter employed by the New York Times at the time he investigated the Jascalevich matter. Judge Arnold knew all this. Indeed, this is why he called for an *in camera* disclosure rather than directing the routine compliance with a subpoena expected of every citizen. It is also noted that at no previous point in his travel through the courts had Farber ever defined what evidence he was barred from introducing before Judge Arnold. It is interesting to speculate what Judge Arnold's reaction would have been if, on cross examination, Farber had been forced to testify at length on his activities as an author (if Jascalevich's counsel had such information at that time).

7. This case demonstrates the necessity of further calm and deliberate review of the fair trial—free press conundrum where, as here, in a criminal proceeding a reporter claims a first amendment privilege against disclosure and honoring his claim will injure sixth amendment rights of a defendant. A host of questions are raised. Should a court accept the reporter's assertion without question? Human experience teaches us that, under stress, people do not always tell the truth. Farber, in this instance, was insensitive to what ethical standards required of him in the way of full disclosure

* Needless to say, the "unpublished" information sought by the subpoena obviously covered such things as the manuscript. This obviously is another reason why Farber did not want to turn over anything to Judge Arnold.

to Judge Arnold. Should a reporter's cry of First Amendment privilege require courts to beat an ignominious retreat, with abjuration of a defendant's Sixth Amendment rights? Who is to dissolve the impasse? Under our system the judicial branch performs the role of the dispute resolver. What is there about the reporter's role that removes him from that kind of resolution of disputes wherein his work is involved?

These questions can best be left to another day. Since Farber wishes to withdraw his petition rather than expose his manuscript to this court's view, I shall enter an order dismissing the matter.