UNITED STATES of America

v.

Gerald M. CUTHBERTSON, Allan G. Gorrin, John Klemans, Paul L. Gorrin, Richard Vickers Day, III, Samuel Bauman, and Thomas P. De Vita.

Crim. No. 79–296.

United States District Court,
D. New Jersey.

March 24, 1981.

William W. Robertson, U. S. Atty. by James A. Plaisted and Robert S. Bonney, Asst. U. S. Attys., Newark, N. J., for the United States of America.

Andrew R. Jacobs, Lanigan, O'Connell & Jacobs, Basking Ridge, N. J., for defendant Cuthbertson.

Leonard Meyerson, Miller, Hochman, Meyerson & Schaeffer, Jersey City, N. J., for defendant Allan G. Gorrin.

John J. Barry, Frohling, Fitzpatrick & Barry, Newark, N. J., for defendant Paul L. Gorrin.

John W. Noonan, Newark, N. J., for defendant Bauman.

Thomas R. Raimondi, Diamond, Diamond & Afflitto, Wayne, N. J., for defendant De Vita.

William J. Martini, Passaic, N. J., for defendant Klemans.

Clyde A. Szuch, Pitney, Hardin & Kipp, Morristown, N. J. and Timothy Dyk, Wilmer, Cutler & Pickering, Washington, D. C., for CBS, Inc., third-party witness.

## OPINION

STERN, District Judge.

The following opinion was delivered orally on March 23, 1981, and revised pursuant to Rule 28 of the Rules of this Court.

This Court has in its possession three edited audio tapes and accompanying edited transcripts of interviews with prospective witnesses in this pending criminal case conducted by the staff of the CBS television program, "60 Minutes." These materials were originally subpoenaed by the defendants in this case, and were submitted to the Court for *in camera* review pursuant to this Court's order of March 6, 1980, insofar as it was affirmed by the United States Court of Appeals for the Third Circuit on July 23, 1980. One week prior to trial, we must now address two questions: first, whether CBS must produce for *in camera* inspection those

portions of the interviews which the network has deleted from the materials already submitted; and second, whether the materials now in the Court's possession should be turned over to the defendants because they are exculpatory and regardless of whether they prove to be admissible as prior inconsistent statements.

## I. BACKGROUND.

On September 5, 1979, a federal grand jury in Newark, New Jersey, returned a twenty-count indictment charging the principals of a fast-food franchising operation known as "Wild Bill's Family Restaurants" ("Wild Bill's") and two of their associates with conspiracy to defraud and fraud, in violation of 18 U.S.C. §§ 2, 371, 1341, 1343, and 2314. On February 14, 1980, about a month before the scheduled commencement of trial, defendants served on CBS a subpoena *duces tecum* for the production of all tapes, notes, and other documents of any kind pertaining to the preparation of a "60 Minutes" segment entitled "From Burgers to Bankruptcy" broadcast on December 3, 1978. The segment focused on the activities of Wild Bill's operators and included interviews with a number of investors in the franchise organization. It suggested that these franchisees and other potential franchisees may have been defrauded, and concluded with a statement by correspondent Mike Wallace that the United States Attorney's Office in Newark was investigating the matter and was expected to present evidence to a grand jury in the near future.

CBS moved to quash the subpoena, and following a hearing on March 4, 1980, this Court ruled that the subpoena was overbroad and not enforceable under Rule 17(c), Fed.R.Crim.P. For example, the Court found no basis to require the production of any notes or other internal memoranda. We did, however, find a basis for the production of statements by individuals whom the government expected to call as witnesses, and in order to avoid potential disruptions of the trial, the Court ordered CBS to:

> give over to this Court forthwith for *in camera* inspection all film and audio tapes or written transcripts which reproduce verbatim or substantially verbatim any conversations by individuals names in [a witness list supplied by the government].

Following the March 4 hearing, defendants served CBS with a second subpoena seeking production of verbatim or substantially verbatim statements made by anyone on a long list of franchisees or potential franchisees and former employees of Wild Bill's. At a March 6 hearing, the Court modified this subpoena to provide that only statements by franchisees and potential franchisees be compiled, and that those statements be turned over to the Court for *in camera* inspection along with the statements of the individuals on the witness list.

CBS informed the Court that it would not comply with the order, and the Court held CBS in civil contempt and imposed a fine of one dollar per day for every day that CBS refused to comply. The Court of Appeals stayed the contempt order pending an appeal by CBS.

On July 23, 1980, the Court of Appeals filed its opinion in *United States v. Cuthbertson*, 630 F.2d 139 (3rd Cir. 1980). It held that CBS would not be required to turn over statements in its possession prior to trial for *in camera* review unless defendants were able to make an initial showing (1) that the documents are likely to be evidentiary and relevant at trial and (2) that the application is made in good faith and not as a general "fishing expedition." The Court of Appeals found that such a showing had been made as to the subpoena covering those persons on the government's witness list because their statements might be admissible at trial as prior inconsistent statements. With respect to the second subpoena, which called for statements by individuals whom the government did not intend to call as witnesses, the Court of Appeals held that defendants had failed to meet their burden:

> [C]ounsel for the defendants admitted that they did not know whether the state-

ments of the franchisees and potential franchisees contained any exculpatory information. Thus, the defendants' broad request . . . was based solely on the mere hope that some exculpatory material might turn up. We do not think that this "mere hope" justifies enforcement of a subpoena under rule 17(c).

*Id.* at 146. Therefore, this Court's order enforcing the first subpoena, as modified, was upheld; the order enforcing the second subpoena, as modified, was reversed.

Finally, the Court of Appeals addressed CBS's contention that it enjoyed a qualified privilege, based on the First Amendment, that precluded submission of the statements even for *in camera* review. The court confirmed the existence of such a qualified privilege, but held that its applicability to the statements in CBS's possession required a weighing of the privilege against the defendants' interest in obtaining the material, an exercise which could only be performed after the district court had reviewed the material *in camera.*

On October 21, 1980, defendants filed a petition for certiorari with the Supreme Court, which was denied on January 26, 1981. —— U.S. ——, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981).

This Court conducted a status conference on February 5, 1981, to determine whether CBS intended to comply with the rulings of this Court and the Court of Appeals. CBS agreed to turn over the required material no later than March 15, and the Court, noting CBS's willingness to comply, continued the stay of the contempt order. On March 3, 1981, CBS supplied the Court with edited audio tapes and transcripts of three interviews by "60 Minutes" correspondent Mike Wallace with two individuals on the government's witness list. CBS represents that these are the only verbatim or substantially verbatim statements by persons on that list.[1]

The tapes and transcripts submitted for *in camera* review reflect interviews between Wallace, the prospective witness or witnesses, and other unidentified individuals. The statements of these other unidentified individuals, however, have been deleted by CBS from the tapes and transcripts, because, according to the network, the statements are beyond the scope of the material covered by the Court's order.

A second status conference was conducted on March 19, at which time the Court indicated its tentative view: (1) that the conversations contained in the tapes and transcripts in the Court's possession are impossible to understand completely because CBS's excision of statements by non-witnesses removes from context the statements of the witnesses; (2) that the material in the Court's possession may contain statements material to the preparation of the defense; and (3) that the Court may be under an obligation to turn over these exculpatory statements to the defense at trial, regardless of whether or not they would be admissible as *prior inconsistent statements.*

CBS denies that the Court can order production of the remainder of the conversations, even if the transcripts as submitted are not in all cases comprehensible. Further, it denies that the Court may turn over to the defendants at trial the materials already submitted, *even if they contain exculpatory evidence.* CBS concedes that the materials may contain exculpatory evidence. Tr. of Mar. 19, 1981, at 36–37. Nonetheless, it admits only that the statements might be turned over, following a *strict balancing of interests,* after the witnesses on the tapes have testified, and only then if they testify contrary to what the statements in the Court's possession indicate. Even under those conditions, CBS insists upon an opportunity to appeal at that time, that is, in the middle of trial, any unfavorable decision. Thus, on the one hand, CBS seeks to preclude any pretrial

---

1. On March 9, 1981, the government submitted a list of witnesses not on the original list who may be called in rebuttal. CBS represents that one of the tapes includes a conversation with one individual on this list, and states that it will

provide this portion of the interview if and when the individual is in fact called as a rebuttal witness. CBS's letter of Mar. 20, 1981, at 1–2n.

adjudication, but on the other hand indicates that it would seek immediate review of adverse rulings made at trial. Any appeal in the midst of trial would of necessity severely disrupt the proceedings, a result this Court has continually sought to avoid.

## II. *SUBMISSION OF STATEMENTS DELETED FROM MATERIALS PROVIDED TO THE COURT.*

As noted above, CBS has submitted materials relating to three separate conversations between Mike Wallace and individuals on the government's witness list. Each of these conversations includes unidentified persons, apparently franchisees other than those on the government's witness list. Although these persons appear to have participated actively in the dialogue, CBS has deleted their statements from the tapes and transcripts submitted to the Court. Thus, the materials include numerous statements by the prospective witness or witnesses that do not follow questioning by Wallace but rather the deleted material represented by asterisks. That is, it appears that many answers on the transcripts are in response to statements by other interviewees which have been deleted. In many of these instances, the Court can only speculate as to the course of the conversation. The numerous references in the transcripts to "crosstalk" and the fact that many of Mr. Wallace's questions are intentionally open-ended—that is, so that any of the individuals present may volunteer an answer—make clear that the dialogue was conducted between the interviewees as well as with the interviewer. The statements of the unidentified interviewees are, therefore, necessary for a complete understanding of the witnesses' statements.

CBS has stated its position that it does not intend to comply with an order of this Court compelling the production of the remainder of the statements made at the relevant interviews. It contends that, "such non-witness statements, not being evidentiary, are not subject to *in camera* inspection under Rule 17(c) nor should they be submitted to the Court since this would

necessarily breach the qualified First Amendment privilege afforded to CBS with respect to those materials." CBS's letter of Mar. 20, 1981, at 2. However, CBS suggests that it would be willing to forego its position that the unredacted statements are not produceable if, but only if, the Court is willing to accede to CBS's position that such statements may not be turned over to the defendants until after the witnesses testify and then only under limited circumstances.

The power of this Court to require CBS to produce for *in camera* review the statements of individuals on the government's witness list is now beyond dispute. *United States v. Cuthbertson, supra.* Equally clear is the Court's power to order production of the unredacted statements should it determine that they are necessary to an understanding of what the Court already possesses.

At trial the Court has the discretion to permit the introduction of otherwise inadmissible evidence for the limited purpose of placing excerpted evidence in its proper context. *See* F.R.E. 106. For example, the Second Circuit, in a long line of cases, has held that otherwise inadmissible statements by a third party on a tape recording may be introduced for the limited purpose of explaining to the jury admissions on the tape by a defendant. *United States v. Murray*, 618 F.2d 892, 900–01 (2nd Cir. 1980); *United States v. Lubrano*, 529 F.2d 633 (2nd Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976); *see also United States v. Lemonakis*, 485 F.2d 941, 947–50 (D.C.Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). Even if, as CBS contends, the sole purpose of the *in camera* review is to determine if statements may be admissible at trial, the judge like the jury, is entitled to a complete record in order to decipher the statements and make an independent and intelligent decision.

CBS relies on but a single case, *United States v. Harris*, 542 F.2d 1283, 1293 (7th Cir. 1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977), for its argument that the statements by non-wit-

380

nesses are absolutely protected. In *Harris*, the prosecution provided the defense, pursuant to its obligations under the Jencks Act, 18 U.S.C. § 3500, with statements by a witness in a prior joint interview, but did not provide statements by the other person present at that interview. On appeal, the defendants argued that the trial court's refusal to inspect the complete, unedited documents *in camera* constituted an abuse of discretion. The court of appeals rejected this argument:

> If separate reports had been prepared on the portions of the interview dealing with each person, there could be little question that the Government would only be required to produce the report pertaining to the witness. The Act contemplates that the Government will make this type of selection. We find no significant difference between the Government making this type of selection and the selection the Government made in this case. . . . The problem presented in this case is not a matter of the Government refusing to submit materials in the face of a court order; the court expressed no interest in seeing the materials.

*Id.* at 1293. We interpret the court's opinion to mean only that a defendant has no absolute right to an *in camera* inspection by the trial court of the complete records of all interviews in which more than one person was questioned. Indeed, there was nothing in *Harris* to suggest any problem of understanding the context of the interviews without the deleted materials. At most, *Harris* stands for the proposition that whether or not to view the statements of a nonwitness when included with those of a witness is within the discretion of the court.

In this case, the Court finds that it is unable to perform the functions required of it without access to the remainder of the conversations. It is simply impossible for the Court to decide that certain portions of the submitted materials should or should not be turned over to the defendants during the trial without being able to place the remarks within the context of the entire conversation.

CBS contends that it, and not the Court, is entitled to make such "editorial" judgments. The Court has no guarantee that those determinations would be made in the interests of all the parties to this dispute and not solely in the interests of CBS, if CBS, the litigant, were to be the judge. From the beginning, the posture of CBS in this matter has been purely adversarial. It first asserted an absolute privilege that would have barred the turning over of any documents whatsoever; it then asserted a qualified privilege against turning over documents for *in camera* review. Now that the Court of Appeals has rejected those positions, CBS conditions the turning over of the remainder of the statements on the willingness of this Court to conform to CBS's view on another substantive question. With this background in mind, this Court cannot and will not rely on the *ex parte* decisions of an interested party as to the propriety of the editing.

■ Thus, the Court orders that CBS turn over forthwith the remainder of the tapes and transcripts of those conversations involving individuals on the government's witness list. The Court will not bargain with CBS by agreeing to modify its position on the separate issue of whether these materials will be turned over to the defense if they are found to be exculpatory irrespective of their eventual admissibility.

One year ago, CBS refused to comply with an order of this Court. In view of the difficult legal issues which were then unresolved, this Court imposed a technical fine of one dollar per day solely to complete the record and make the issue ripe for review. Refusal to comply with today's order would present a much different situation. The Court does not see any justification for such a refusal. This Court simply cannot evaluate the statements now in its possession standing in isolation. Whether or not the Court is correct in its ruling on the separate issue of whether the materials may be turned over to the defense at the trial if it finds them exculpatory, CBS would be able to obtain review before disclosure of any kind. Thus, it waives nothing and loses

nothing by submitting the remaining portions of the conversations necessary to the completeness and intelligibility of what the Court already has.

Thus, if CBS does not today indicate its willingness to comply with the Court's order, it will be held in civil contempt. As our Circuit has recently confirmed, civil contempt is an appropriate means both to coerce compliance with the court's directives and to vindicate the court's institutional authority. *United States v. Criden*, 633 F.2d 346, 352 (3rd Cir. 1980); *see In re Farber*, 78 N.J. 259, 394 A.2d 330, *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). We leave for the moment the penalty which this Court will impose, for it is the hope of the Court that CBS may decide to comply and that it will be unnecessary to fix a penalty.

### III. WHETHER MATERIAL MAY BE TURNED OVER TO DEFENDANTS AT TRIAL REGARDLESS OF ITS ADMISSIBILITY.

The only remaining issue now before the Court is whether it should turn over to the defendants at trial the statements of projected witnesses already in the Court's possession, irrespective of whether they prove to be admissible as prior inconsistent statements.

If the materials had remained in the sole possession of CBS, defendants would not be entitled to production now unless they were able to satisfy a four-part test:

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Cuthbertson, supra*, 630 F.2d at 145, *quoting from United States v. Nixon*, 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974).

Were this material to repose solely in CBS's file today, defendants would have difficulty meeting at least the first part of that test. The Court of Appeals upheld the subpoena directed to the statements of projected witnesses on the assumption that such statements might be introduced into evidence on cross-examination of those witnesses as prior inconsistent statements. That opinion implies that the admissibility of the statements cannot be predicted with complete accuracy prior to trial. It is possible that the government will decide not to call those particular witnesses, or that the witnesses' testimony will be entirely consistent with their prior positions. The fact that the information in the text of the prior statements may be otherwise useful to the defense is not considered in the *Nixon/Cuthbertson* test. In addition, if the material were in the possession of CBS alone, defendants would be unable to meet the third part of the test; that is, they would not be able to show that they could not properly prepare for trial without production.

Whether or not this Court, without first having viewed these statements *in camera*, could require CBS to produce them directly to the defendants is not now the issue. The fact is that, in accordance with the directives of the Court of Appeals, CBS *has* supplied the Court with three statements, partially edited, of prospective government witnesses. Under these unusual circumstances, the Court must now determine whether to turn over materials in *its* possession to the defendants at trial not because they prove to be admissible, but because they are exculpatory. Taking into account that it has reviewed the materials *in camera* and that the Court has an obligation beyond that of disinterested third parties to the administration of justice, the Court must balance the interests of these criminal defendants against the interests of the network.

On the basis of our *in camera* review of the three transcripts submitted by CBS, we have determined that portions of the tran-

scripts would materially aid the defendants in the preparation of their defense.[2] In explaining this finding, we must necessarily be circumspect, so that the confidentiality aspects of CBS's position will not be mooted. In each of the submitted interviews, Mike Wallace, on behalf of CBS, incisively probes the state of mind of alleged victims of the defendants' practices, and at times seems to suggest that the victims-interviewees did not exercise reasonable judgment. The state of mind, both of the franchisees and the defendants, is at the very core of this case. It is clear from the indictment that the government will try to prove that defendants knowingly made false representations to prospective franchisees intending to induce them to invest substantial sums of money in the enterprise. To the extent that the submitted materials suggest that the franchisees knew that the representations were untrue, or did not rely on them, they would be of extreme importance to the preparation of the defense. It is clear that certain portions of the transcripts suggest that some of the victims themselves may have been partially responsible for the loss of some of their investment. They indicate that some of the investors, knowledgeable in financial matters, failed to investigate the enterprise completely. Such information would be of use to a defendant attempting to show that his representations, although perhaps inaccurate, were nonetheless innocent, and to a defense which must confront these witnesses on the stand. The information would be even more important as it relates to franchisees whom the government elects not to call because their testimony may be unfavorable to the prosecution. The right to call witnesses on one's behalf is a vital component of the defendants' Sixth Amendment guarantees. *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

The fact that information may be material to the preparation of the defense does not obligate a third party to submit it to the defendants; and CBS takes the position that without the coercive power of the court it would give no information to the defendants, no matter how exculpatory. The obligations of the Court, however, are not synonymous with those of third parties. The prosecution has the burden to disclose to the defense all evidence which might create a reasonable doubt that would not otherwise exist, *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("*Brady*"). The Court, unlike the prosecution, is not an adversarial party in the proceedings. It sits neither to prove guilt nor establish innocence; but merely to maintain a fair trial. It is almost inconceivable that a court, possessing exculpatory information, must remain silent when the prosecution possessing identical information would be compelled to speak.

CBS contends that the Court has no obligation to turn over documents material to the preparation of the defense. It relies on several cases which have held that a court, or probation office, need not supply the defense with the presentence report of a prosecution witness containing the equivalent of *Brady* material. *See, e. g., United States v. Trevino*, 556 F.2d 1265 (5th Cir. 1977) (defendants not entitled to disclosure of presentence report under *Brady*, Jencks Act, or Fed.R.Crim.P. 16); *United States v. Dingle*, 546 F.2d 1378 (10th Cir. 1976) (defendants not entitled to presentence report under *Brady* of Jencks Act); *United States v. Trejo-Zambrano*, 582 F.2d 460 (9th Cir.), *cert. denied*, 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978) (defendant not entitled to presentence report under Fed.R.Crim.P. 16). Each of these cases involved a presentence report, to which attaches a special measure of confidentiality. The importance of confidentiality was stressed by the Tenth Circuit in *Dingle*:

> We concur in the trial court's finding that a presentence report is not a produ-

---

2. We are of course unable to determine if additional portions of the transcripts would be equally useful to the defense viewed in the context of the entire conversations because we have been denied much of the conversations.

cible "statement" under the Jencks Act. The need for maintaining the confidentiality of a probation report outweighs any possible need for its discovery under the Jencks Act.... A presentence report is prepared exclusively at the discretion of and for the benefit of the court. It is essential that the confidentiality of such a report be protected to insure the free flow of information.

546 F.2d at 1380–81. None of these cases held that a presentence report could not be released to a defendant under any circumstances; each held only that the trial court did not err by refusing to release the report.

Our own Circuit has made clear that the presentence report of a prosecution witness is not Jencks Act material, but has not yet ruled on whether a court has an obligation akin to the prosecutor's obligation under *Brady*. In *United States v. Dansker*, 537 F.2d 40 (3rd Cir.), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), the district court found that the presentence report of a prosecution witness did not constitute *Brady* material and that presentence reports in general were not obtainable under the Jencks Act. The Court of Appeals, noting that "defendants seem to have abandoned the *Brady* argument pressed below," *id.* at 61, affirmed Judge Lacey's holding that presentence reports were not within the scope of the Jencks Act but did not address the *Brady* argument. *See United States v. Cuthbertson, supra*, 630 F.2d at 146 (denying enforcement of subpoena for production of non-witness statements because defendants did not make sufficient showing that the statements contain exculpatory material).

It is not clear that a judge has the same obligations that *Brady* imposes on a prosecutor. It is clear, however, that a judge has a unique obligation to the administration of justice, and that he may not refuse, *per se*, to divulge information in his possession which is potentially exculpatory merely because the information does not meet the standard of Rule 17. Indeed, the Supreme Court has based the exclusionary rule for evidence obtained in violation of the Fourth Amendment in part on the obligations of the judge to insure that every trial is fundamentally fair:

[T]here is another consideration—the imperative of judicial integrity. It was of this that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in *Olmstead v. United States*, 277 U.S. 438, at 469, 471, [48 S.Ct. 564, 569, 72 L.Ed. 944] more than 30 years ago. "For those who agree with me," said Mr. Justice Holmes, "no distinction can be taken between the Government as prosecutor and the Government as judge." 277 U.S. at 470, [48 S.Ct. at 575] (Dissenting opinion.) "In a government of laws," said Mr. Justice Brandeis, "existence of the government will be imperilled if it fails to observe the law scrupulously."

*Elkins v. United States*, 364 U.S. 206, 222–23, 80 S.Ct. 1437, 1441–46, 4 L.Ed.2d 1669 (1960). In balancing the needs of justice, it is clear that in some instances the confidentiality of the presentence report would be overborne by the possibility of acquitting an innocent defendant. For example, a judge would be in derogation of his constitutional oath if he were to refuse to disclose a statement contained in the presentence report of a co-defendant that he, and not the defendant on trial, committed the crime. Thus, the Court must consider its own obligations as well as the interests of the parties in determining whether to turn over materials in its possession.

There is no question but that CBS, as a news organization, has substantial interests at stake, interests which have prompted the Third Circuit to bestow upon the network a qualified privilege not to produce nonpublished materials relevant to either side in a criminal case. *United States v. Cuthbertson, supra*, 630 F.2d at 146–48. The *Cuthbertson* case spells out this privilege in some detail. First, it holds that the qualified privilege, first recognized in a civil case, *Riley v. City of Chester*, 612 F.2d 708 (3rd Cir. 1979), extends to criminal cases. *Compare New York Times v. Jascalevich*, 439 U.S. 1317, 1322, 99 S.Ct. 6, 10, 58 L.Ed.2d 25 (1978) (White, J., in chambers) ("There is no present authority in this Court either that

newsmen are constitutionally privileged to withhold duly subpoenaed documents material to the prosecution or defense of a criminal case or that a defendant seeking the subpoena must show extraordinary circumstances before enforcement against newsmen will be had"); *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (journalists do not enjoy privilege to refuse to testify before a grand jury to answer questions relevant to a criminal investigation). Second, it holds that the privilege is not limited solely to the protection of sources. 630 F.2d at 147. It recognizes two additional interests: "preventing intrusion into the editorial process, and avoiding the possibility of self-censorship created by compelled disclosure of sources and unpublished notes." [3]

The interests of CBS in precluding disclosure of the materials submitted for *in camera* review are set forth in the affidavits of Robert Chandler, Senior Vice President of CBS and former director of public affairs broadcasts for CBS News; William Leonard, President of CBS News; Marion Goldin, producer of "60 Minutes;" and Mike Wallace, "60 Minutes" correspondent. These affidavits stress that this case implicates the three interests cited by the Court in *Cuthbertson*. First, CBS points out that the interviews provided for "From Burgers to Bankruptcy" were given with the expectation that the sources would remain confidential. Second, the affidavits explain that the efforts required to cull the program's voluminous files for the information requested would entail an enormous effort, and would divert the network from present news-gathering activities. The 16-minute report, they say, required over 100 interviews and 15 hours of tape.[4] Third, the affidavits assert that interference in general by the courts and litigants with news-gathering activities will impede the free flow of information to and by the news media. This last point was expressed as follows in Mr. Wallace's affidavit:

The growing efforts of both governmental and private litigants to exploit professional journalists as their unwilling investigators have, I believe, the inevitable tendency of increasing suspicion of the news media among potential news sources.

Wallace aff. ¶ 8.

In this case, the first two asserted interests are no longer relevant. As the Court of Appeals recognized, the sources are no longer confidential. 630 F.2d at 147. In fact, the government has filed with the Court waivers by all of its witnesses permitting disclosure of their statements to CBS. Even if no such waivers were on file, it is doubtful whether anyone who subjected himself or herself to a group interview which was videotaped and audiotaped in front of a cameraman and assistant cameraman, sound man, lighting man, electrician, and at least one member of the editorial staff in addition to the interviewer and producer, and who made a statement for the express purpose of public broadcast, can reasonably have expected his or her statements to remain confidential. This point was rendered even more forceful by Mr. Chandler's testimony this morning, which indicates that the initial filming occurred not only in the presence of the interviewees but of at least a dozen and a half onlookers, only some of whom were also interviewed, and none of whom were members of the CBS staff. This is not a case in which a shadowy figure has whispered in the journalist's ear in an underground garage only after having been promised absolute confidentiality. The individuals involved here, the transcripts suggest, wanted to communicate their story to the public, for whatever reasons they may have had.

These affidavits, with the exception of Mr. Chandler's, were submitted before the Court of Appeals ruled that CBS was re-

---

**3.** Notes are not now, and never have been, at issue in this case. This Court, at the March 4, 1980, hearing—prior to the appeal by CBS— ruled that reporters' notes are not subject to subpoena upon this record.

**4.** Only half of this tape consists of recorded interviews; the remainder constitutes reaction shots and other miscellaneous filming. Goldin aff. ¶ 4.

quired to submit the materials now in the Court's possession. It is understandable that they speak of the burden of compiling the materials in order to submit them. The significance of this burden, however, is now moot. The Court of Appeals has already considered that burden, and required CBS to produce to the Court all statements by individuals on the government's witness list. CBS has complied, except as noted in Part II *supra*, and the materials are now in the Court's possession. If the Court determined to turn the materials over to the defense prior to trial, it would require no additional effort on the part of CBS.[5]

Finally, the Court must consider the general interest of the media in its ability to pursue sources of information without the interference of courts or litigants. This interest, as the court in *Riley v. City of Chester, supra,* recognized, is an important one. Investigative reporting of the type involved here plays a highly useful role in our society. In evaluating this interest, however, the Court may consider the reasonable expectations of the news-gatherer at the time both of the investigation and the broadcast. In this case, the "60 Minutes" investigation was contemporaneous with an investigation by the United States Attorney's Office in Newark. That investigation was referred to in several portions of the interviews in the Court's possession. Those interviews were conducted as much as six months before the broadcast was aired. In fact, Mr. Wallace closed the broadcast of "From Burgers to Bankruptcy" with a reference to the government's investigation.[6] Mr. Wallace and others in the CBS news organization must have realized that the statements from the "victims" —using Mr. Wallace's term—might be relevant to a criminal investigation or trial, and that criminal defendants might later seek them in order to prepare for trial. Such investigations serve important functions even when they coincide with investigations by the United States Attorney or Department of Justice; the fact that the authorities have initiated an inquiry does not stay the hand of the news media. However, the Court may consider the journalist's choice to enter an area knowing that the interest of others in his material—not as work product but as direct evidence—would compete with his own. *See Farber v. Job,* 467 F.Supp. 163, 166 (D.N.J.1978).

█ We deal here with an organization which gathered information about a possible crime with knowledge that that crime was the subject of an ongoing grand jury investigation. Witnesses and potential victims were sought out and closely interrogated. Their statements were taken verbatim. Their voice inflections were recorded. Facial nuance was captured on film. The network broadcast across the nation's airwaves some—but not all—of the statements of these potential government witnesses with the full expectation that these interviewees might later take the witness stand. Much of the material which was aired was unfavorable to these defendants, while much of the exculpating material was left on the cutting room floor. Thus, on the one hand, CBS has aired material which impli-

---

5. The burden of compiling these materials may not have been as great as the Court was initially led to believe. According to the testimony of Mr. Wallace, transcripts were prepared by CBS soon after filming of the interviews. CBS, it should be noted, has submitted corrected transcripts as well as the original transcripts, which contained some errors. The Court's order, however, required production only of transcripts already in existence.

6. At the outset of the hearing conducted today, it seemed to be CBS's position that it did not, at the time of the interviews, know that the government was conducting an inquiry. Rather, the network suggested it was unclear as to whether such an inquiry was or even would be conducted, because some of the interviewees had said that they did not think the government was interested in the Wild Bill's operation. In the course of the hearing, it became plain that from the time of the earliest interviews in June 1978, CBS was made aware by the interviewees of the investigation and attempted to confirm that investigation by reaching out to the FBI and the United States Attorney's Office. Despite Mr. Wallace's testimony that he respected the "sanctity of grand jury proceedings," Tr. of Mar. 23, 1981 at 105, these efforts were made solely in order to ferret out yet another news source for the program which CBS was assembling.

cated these defendants in criminal conduct; on the other hand, it did not air and now refuses to provide to these same defendants statements that would materially aid their defense. In view of the foregoing, no reasonable balance can be struck which favors CBS' rights to secrecy over those of the defendants to defend at trial.

In sum, the Court has balanced the relevant interests of the defendants and CBS as a representative of the broadcast media, and considered its own obligation to preserve judicial integrity. We have determined that portions of the transcripts and tapes which would be important to the preparation of the defense should be turned over on the first day of trial. The Court attaches particular significance to the following facts: first, that the motivation and credibility of the interviewees are likely to play a critical role in this case, *see United States v. Criden, supra,* 633 F.2d at 348; second, that the interviewees have waived whatever interest they may have had in confidentiality; third, that turning over the documents to the defense will impose no further administrative burden on CBS; and finally, that CBS has failed to advance anything more than a purely speculative interest in the autonomy of the news-gatherer, while the Court finds that the defendants have a concrete and immediate need for the information.

As we have stated earlier, the Court does not intend to turn over the documents to the defendants until CBS has had the opportunity to seek review. With the trial date one week away, however, the Court is concerned about the prospect of another lengthy delay in these proceedings. Trial has already been postponed for more than a year as the result of the controversy between the defendants and CBS. This delay has created numerous problems in managing a six-defendant case. For example, one of the defense attorneys was forced to withdraw and the Court was required to appoint substitute counsel on short notice. Both the government and the defense, moreover, are prejudiced by the increased difficulty in locating witnesses and the likelihood that the memories of the witnesses have dimmed.

Therefore, the Court will turn over the relevant information to the defendants immediately after the trial has begun unless otherwise instructed by the Court of Appeals.

\* \* \*

After the Court delivered the above opinion, CBS was granted until this morning to decide whether to comply with the Court's order requiring production of the unredacted versions of the tapes and transcripts in the Court's possession. CBS appeared this morning and submitted to the Court the materials required by the order. There is no need, then, to hold CBS in contempt.